**JENNER & BLOCK LLP**
David R. Singer (SBN 204699)
dsinger@jenner.com
Julie A. Shepard (SBN 175538)
jshepard@jenner.com
Lauren M. Greene (SBN 271397)
lgreene@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA  90071-2246
Telephone: (213) 239-5100
Facsimile:  (213) 239-5199

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

DISNEY ENTERPRISES, INC., a Delaware corporation; UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, a Delaware limited liability limited partnership; WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; MARVEL CHARACTERS, INC., a Delaware corporation; MVL FILM FINANCE LLC, a Delaware limited liability company; LUCASFILM LTD. LLC, a California limited liability company; TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation; DC COMICS, a New York general partnership; THE CARTOON NETWORK, INC., a Delaware corporation; TURNER ENTERTAINMENT CO., a Delaware corporation; HANNA-BARBERA PRODUCTIONS, INC., a Delaware corporation; and DREAMWORKS ANIMATION L.L.C., a Delaware limited liability company,

Plaintiffs,

Case No. 25-8768

**COMPLAINT FOR DIRECT COPYRIGHT INFRINGEMENT AND SECONDARY COPYRIGHT INFRINGEMENT; DEMAND FOR JURY TRIAL**

v.

MINIMAX, a Chinese company;
SHANGHAI XIYU JIZHI TECHNOLOGY
CO. LTD., a Chinese limited company;
NANONOBLE PTE. LTD., a Singaporean
private limited company and DOES 1
through 20, inclusive,

Defendants.

Plaintiffs Disney Enterprises, Inc., Marvel Characters, Inc., MVL Film Finance LLC, Lucasfilm Ltd. LLC, and Twentieth Century Fox Film Corporation, (collectively, "Disney"), Universal City Studios Productions LLLP and DreamWorks Animation L.L.C. (collectively "Universal"), and Warner Bros. Entertainment Inc., DC Comics, The Cartoon Network, Inc., Turner Entertainment Co., Hanna-Barbera Productions, Inc. (collectively "Warner Bros. Discovery") (Disney, Universal, and Warner Bros. Discovery are referred to collectively as "Plaintiffs") bring this lawsuit for direct and secondary copyright infringement under the Copyright Act (17 U.S.C. § 101 *et seq*.) against defendant MiniMax, defendant Shanghai Xiyu Jizhi Technology Co. Ltd., of which MiniMax is a division or subsidiary, along with their affiliate and/or agent, and defendant Nanonoble Pte. Ltd. which operates at the direction and under the control of MiniMax (together, "MiniMax"). This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a), and 17 U.S.C. § 501(b). Plaintiffs allege, on personal knowledge as to themselves and information and belief as to others, as follows:

## INTRODUCTION

1.      MiniMax operates Hailuo AI, a Chinese artificial intelligence ("AI") image and video generating service that pirates and plunders Plaintiffs' copyrighted works on a massive scale. MiniMax markets Hailuo AI as a "Hollywood studio in your pocket" – an audacious self-anointed nickname given that MiniMax built its business from intellectual property stolen from Hollywood studios like Plaintiffs. The Hailuo service offers its subscribers an endless supply of infringing images and videos featuring Plaintiffs' famous copyrighted characters. MiniMax completely disregards U.S. copyright law and treats Plaintiffs' valuable copyrighted characters like its own. Not only has it failed to act on Plaintiffs' requests to adopt the reasonable measures taken by several AI services to avoid infringement, MiniMax has actively engaged in and encouraged infringement. MiniMax

even uses Plaintiffs' famous copyrighted characters to advertise and promote its infringing Hailuo service. MiniMax's copyright infringement is willful and brazen.

2. Plaintiffs are the largest movie studios in the world and have been fueling the American engine of creativity for more than a century. Many of Plaintiffs' most successful and critically-acclaimed movies are exceptional – and valuable – because of the larger-than-life characters featured in those works. They include heroes like Spider-Man and Superman; villains like Darth Vader and the Joker; popular animated characters like Shrek and the Minions from *Despicable Me*; astronaut toys like *Toy Story*'s Buzz Lightyear; and classic cartoon characters like Bugs Bunny and Tom and Jerry. The mere presence of these iconic characters on a screen tells a story that was created and developed over many years by teams of dedicated artists and storytellers.

3. MiniMax's bootlegging business model and defiance of U.S. copyright law are not only an attack on Plaintiffs and the hard-working creative community that brings the magic of movies to life, but are also a broader threat to the American motion picture industry, which has created millions of jobs and contributed more than $260 billion to the nation's economy.

4. Plaintiffs' successful monetization of their copyrighted works and characters across so many different channels and markets is not only a testament to their investment in human creativity, but also to Plaintiffs' constant innovation. Few American entertainment companies have embraced creativity and technology like Plaintiffs, from the earliest days of synchronizing sound and film, to creating virtual and immersive experiences at world class theme parks, to pushing the boundaries of animation through groundbreaking rendering software, to using advanced technologies to enhance the magic of filmmaking. These investments of creativity, time, and money are only made possible by the incentives embodied in U.S. copyright law, which grants copyright owners the exclusive right to control and commercialize their own creative works.

5. Whether it is a video game based on the *Star Wars* movies, a theme park attraction featuring Shrek and Donkey, merchandise branded with DC Universe

superheroes, or a subscription service that distributes videos with Plaintiffs' copyrighted characters, *only Plaintiffs* are allowed to build a business around those characters.

6.    MiniMax's Hailuo AI service was developed using innumerable unauthorized copies of Plaintiffs' copyrighted works, and it operates by reproducing, publicly displaying and performing, making available, and distributing infringing copies and derivatives of those works.   If a MiniMax subscriber submits a simple text prompt requesting the character Darth Vader in a particular setting or doing a particular action, MiniMax generates and displays high quality, downloadable images and videos featuring Disney's copyrighted Darth Vader (along with MiniMax Hailuo branding no less):



///
///
///
///
///
///
///
///

7.      Similarly, if a Hailuo AI subscriber submits a simple text prompt requesting Wonder Woman in a particular setting or doing a particular action, MiniMax generates and displays high quality, downloadable images and videos featuring Wonder Woman:



8.      Likewise, if a Hailuo AI subscriber submits a simple text prompt requesting the Minions characters in a particular setting or doing a particular action, MiniMax generates and displays high quality, downloadable images and videos featuring Universal's Minions:



9.    To further commercialize its rampant copyright infringement, without authorization, MiniMax copies and uses *Plaintiffs' copyrighted characters* to *advertise and promote* its Hailuo AI video service to U.S. consumers (falsely implying Plaintiffs' endorsement), as seen in this advertisement on Hailuo AI's official Instagram account displaying an infringing image of Warner Bros. Discovery's the Joker.



///
///
///
///
///
///
///
///
///

COMPLAINT

10.     Without any regard for U.S. copyright laws, MiniMax encourages consumers to download its Hailuo AI app for the express purpose of distributing infringing content featuring Plaintiffs' copyrighted characters.  One recent advertisement coaxes consumers to subscribe to Hailuo AI by enticing them with infringing videos featuring Disney's Groot, Rocket Raccoon, and Spider-Man, and Warner Bros. Discovery's Supergirl:





///

///

///

///

///

COMPLAINT



11.    Another advertisement posted to MiniMax's official WeChat page entices consumers to subscribe to Hailuo AI by showing an infringing image of one of Universal's Minions.



12.     MiniMax could easily stop its theft and exploitation of Plaintiffs' intellectual property.  MiniMax controls what copyrighted content it selects, copies, and includes in Hailuo AI, and it has the means to implement protection measures to prevent the ongoing copying, public display, public performance, and distribution of Plaintiffs' works. MiniMax already has in place technological measures to prevent its distribution and public display and performance of certain images and video such as violence or nudity.  And other AI image- and video-generating services have instituted copyright protection measures that recognize and protect the rights of content creators like Plaintiffs.  These readily available measures could easily be implemented by MiniMax.

13.     Plaintiffs asked MiniMax to stop infringing their copyrighted works.  But MiniMax, which has attracted millions of subscribers and is now reportedly worth $4 billion, blatantly continues to infringe Plaintiffs' copyrights in favor of its own bottom line.

14.     MiniMax's large-scale infringement is systematic, ongoing, and willful, and Plaintiffs have been, and continue to be, substantially and irreparably harmed by it. Plaintiffs bring this action to stop MiniMax's intellectual property theft and to uphold U.S. copyright law and the crucial incentives that reward those who create, not those who take.

## THE PARTIES

15.     Plaintiff Disney Enterprises, Inc. is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California. Disney Enterprises, Inc. owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit A.

16.     Plaintiff Marvel Characters, Inc. is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California. Marvel Characters, Inc. owns or controls copyrights or exclusive rights in content that it or

its affiliates produce or distribute, including those copyrighted works specified in Exhibit A.

17.    Plaintiff MVL Film Finance LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Burbank, California.  MVL Film Finance LLC owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit A.

18.    Plaintiffs Marvel Character, Inc. and MVL Film Finance LLC are referred to collectively as "Marvel."

19.    Plaintiff Lucasfilm Ltd. LLC is a limited liability company organized under the laws of the State of California with its principal place of business in San Francisco, California.  Lucasfilm Ltd. LLC owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit A.

20.    Plaintiff Twentieth Century Fox Film Corporation (also known as "20th Century Studios") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California. 20th Century Studios owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit A.

21.    As noted above, Disney Enterprises, Inc., Marvel Characters, Inc., MVL Film Finance LLC, Lucasfilm Ltd. LLC, and 20th Century Studios are collectively referred to in this Complaint as "Disney."  Exhibit A contains a non-exhaustive, representative list of Disney's works, along with their registration numbers, which MiniMax has directly or secondarily infringed and continues to infringe ("Disney's Copyrighted Works").  All of Disney's Copyrighted Works in Exhibit A constitute original works and copyrightable subject matter pursuant to the Copyright Act, 17 U.S.C. § 101, et seq*.*, and they have been duly registered with the U.S. Copyright Office.  The copyrights set forth in Exhibit A remain valid and subsisting and have been owned and/or controlled by Disney at all times

relevant to the allegations in this Complaint. The registered copyrights for Disney's Copyrighted Works encompass the identified characters appearing therein. Moreover, the visual depictions of the characters constitute copyright protected artwork and audiovisual works.

22. Plaintiff Warner Bros. Entertainment Inc. ("Warner Bros. Entertainment") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Burbank, California. Warner Bros. Entertainment owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit B.

23. Plaintiff DC Comics ("DC Comics") is a New York general partnership with its principal place of business in Burbank, California. DC Comics owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit B. DC Comics as defined herein includes its predecessor entities.

24. The Cartoon Network, Inc. ("The Cartoon Network") is a corporation duly incorporated under the laws of the State of Delaware with its principal place of business in Atlanta, Georgia. The Cartoon Network owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit B.

25. Turner Entertainment Co. is a corporation duly organized under the laws of the State of Delaware with its principal place of business in Burbank, California. Turner Entertainment Co. owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit B.

26. Hanna-Barbera Productions, Inc. is a corporation duly organized under the laws of the State of Delaware with its principal place of business in Burbank, California. Hanna-Barbera Productions, Inc. owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit B.

27.     As noted above, Warner Bros. Entertainment Inc., DC Comics, The Cartoon Network, Turner Entertainment Co., and Hanna-Barbera Productions, Inc. are referred to collectively in this Complaint as "Warner Bros. Discovery"  Exhibit B contains a non-exhaustive, representative list of Warner Bros. Discovery's works, along with their registration numbers, which MiniMax has directly or secondarily infringed and continues to infringe ("Warner Bros. Discovery's Copyrighted Works").   All of Warner Bros. Discovery's Copyrighted Works in Exhibit B constitute original works and copyrightable subject matter pursuant to the Copyright Act, 17 U.S.C. § 101, et seq., and they have been duly registered with the U.S. Copyright Office.  The copyrights set forth in Exhibit B remain valid and subsisting and have been owned and/or controlled by Warner Bros. Discovery at all times relevant to the allegations in this Complaint.   The registered copyrights for Warner Bros. Discovery's Copyrighted Works encompass the identified characters appearing therein.  Moreover, the visual depictions of the characters constitute copyright protected artwork and audiovisual works.

28.     Plaintiff Universal City Studios Productions LLLP ("Universal Pictures") is a limited liability limited partnership organized under the laws of the State of Delaware with its principal place of business in Universal City, California.  Universal Pictures owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit C.

29.     Plaintiff DreamWorks Animation L.L.C. ("DreamWorks") is a limited liability company organized under the laws of the State of Delaware with its principal place of business in Glendale, California.  DreamWorks Animation L.L.C. owns or controls copyrights or exclusive rights in content that it or its affiliates produce or distribute, including those copyrighted works specified in Exhibit C.

30.     As noted above, Universal Pictures and DreamWorks are referred to collectively in this Complaint as "Universal."  Exhibit C contains a non-exhaustive, representative list of Universal's works, along with their registration numbers, which MiniMax has directly or secondarily infringed and continues to infringe ("Universal's

Copyrighted Works").  All of Universal's Copyrighted Works in Exhibit C constitute original works and copyrightable subject matter pursuant to the Copyright Act, 17 U.S.C. § 101, et seq., and they have been duly registered with the U.S. Copyright Office.  The copyrights set forth in Exhibit C remain valid and subsisting and have been owned and/or controlled by Universal at all times relevant to the allegations in this Complaint.  The registered copyrights for Universal's Copyrighted Works encompass the identified characters appearing therein.  Moreover, the visual depictions of the characters constitute copyright protected artwork and audiovisual works.

31.     Disney's Copyrighted Works, Warner Bros. Discovery's Copyrighted Works, and Universal's Copyrighted Works are referred to collectively in this Complaint as the "Copyrighted Works" or "Plaintiffs' Copyrighted Works."

32.     On information and belief, defendant MiniMax is a privately held Chinese company with its headquarters in Shanghai, China.  MiniMax identifies itself as the developer of Hailuo AI (see minimax.io/about, attached as Exhibit D) and it has been publicly reported that MiniMax owns Hailuo AI.  Alternatively, on information and belief, Plaintiffs allege that MiniMax is a subsidiary, division, or d/b/a of defendant Shanghai Xiyu Jizhi Technology Co. Ltd.

33.     Defendant Shanghai Xiyu Jizhi Technology Co. Ltd. ("SXJT") is a Chinese limited company with its headquarters in Shanghai, China.  Plaintiffs are informed and believe that, in connection with the conduct alleged in this Complaint, MiniMax is a division or subsidiary of SXJT.  SXJT controls, in whole or in part, MiniMax and participates in its operations and/or the conduct alleged herein.  For example, SXJT filed the U.S. trademark applications for the mark "MiniMax," attached as Exhibit E.

34.     Defendant Nanonoble Pte. Ltd. ("Nanonoble") is a Singaporean private limited company with its headquarters in Singapore.  Plaintiffs are informed and believe, and on that basis allege that, in connection with the conduct alleged in this Complaint, Nanonoble acts as the agent of MiniMax and/or an affiliate of MiniMax and operates at the direction of and/or under the control of MiniMax.  For example, on the Apple App Store,

Nanonoble is identified as the "Developer" of the MiniMax Hailuo AI app. Also, the payment page for subscription purchases from the Hailuo AI website indicates that that payment is going to Nanonoble. In addition, Nanonoble filed the U.S. trademark applications for the mark "Hailuo," attached as Exhibit F.

## JURISDICTION AND VENUE

35.    This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), and 17 U.S.C. § 501(b).

36.    This Court has personal jurisdiction over MiniMax, SXJT, and Nanonoble Pte. Ltd pursuant to Federal Rule of Civil Procedure 4(k)(2) because they each have purposefully directed their activities at the United States, California, and this District, and have purposefully availed themselves of the benefits of doing business in the United States, California, and this District as detailed below. Plaintiffs are informed and believe, and on that basis allege, that:

a.    MiniMax distributes its infringing Hailuo AI service in the United States, California, and this District as an app through the Apple App Store and Google Play Store, both operated from California. By distributing Hailuo AI through the Apple App Store and Google Play Store, MiniMax has agreed to be subject to personal jurisdiction in California and to the application of the laws of the United States and the State of California in connection with those distribution relationships.

b.    MiniMax conducts extensive and ongoing business with customers in the United States, California, and this District including through the sale of its Hailuo AI service and in-app purchases made by customers in the United States, California, and this District. MiniMax promotes and advertises those in-app purchases on the Hailuo AI app in U.S. Dollars.

c.    In addition, MiniMax conducts business with customers in the United States by providing and selling the Hailuo AI service through its English-language website, https://hailuoai.video, to consumers in the United States. MiniMax's website domain is

registered using services of GoDaddy.com, LLC and Domains By Proxy, LLC both Delaware limited liability companies with offices in the United States.

d.    MiniMax has consented to jurisdiction in the United States as Hailuo AI's Terms of Service expressly provide that, "[a]ny legal suit, action, or proceeding arising out of, or related to, these Terms of Use or the Website shall be instituted exclusively in the federal courts of the United States or the courts of the Singapore…"

e.    MiniMax also uses Cloudflare, Inc, a Delaware corporation headquartered in San Francisco, California, for content delivery network ("CDN") services in the United States and, on information and belief, in this District.  In general, a CDN is a group of servers distributed across various geographic areas that are utilized to enhance a website user's experience with the website.  A CDN caches, *i.e.*, temporarily stores, assets needed to load a website such as video and image files.  On information and belief, when a Hailuo AI subscriber in the United States asks Hailuo AI to generate a video or image (including images and videos that infringe Plaintiffs' Copyrighted Works), a copy of that file is cached on Cloudflare servers geographically located near that subscriber.  Additionally, when someone visiting Hailuo AI's Explore page views a video displayed there (including videos that infringe Plaintiffs' Copyrighted Works), a copy of that video file is cached on a Cloudflare server geographically located near the requesting visitor.  In other words, MiniMax is using Cloudflare servers in the United States, and on information and belief, in this District to store copies of and publicly display and publicly perform the infringing images and videos from its Hailuo AI.

f.    In order to use Hailuo AI on its website, subscribers need to sign up for the service using an existing Google or Apple account.  Subscribers in the United States pay for their subscriptions and/or for credits to generate videos and images in Hailuo AI in U.S. dollars.  MiniMax uses Stripe, Inc., a Delaware corporation headquartered in San

Francisco, California, as the payment processor for purchases made by MiniMax's customers in the United States.

g.    MiniMax has availed itself of United States' intellectual property laws and protection by filing several trademark applications in the United States Patent and Trademark Office for Hailuo AI.  In trademark applications for the mark "Hailuo," MiniMax confirms that it intends to use its Hailuo mark in commerce in the United States for "software for creating and editing music and video by artificial intelligences."[1]  Its applications also provide that MiniMax intends to use the Hailuo mark in connection with the sale of goods and services in the United States including, but not limited to, computer software, software for mobile phones, and producing film, radio, television, music, and podcasts.  In trademark applications for the mark "MiniMax," MiniMax confirms that it intends to use the MiniMax mark in commerce in the United States in connection with providing artificial intelligence services, streaming audio, visual, and audiovisual material, and producing film, radio, television, music, and podcasts.

h.    MiniMax has further availed itself of the laws of the United States by expressly stating on Hailuo AI's Terms of Service that Hailuo AI is "protected by United States and international copyright, trademark, patent, trade secret, and other intellectual property or proprietary rights laws."

i.    MiniMax has targeted consumers in the United States, California, and this District through its social media platforms and advertisements to U.S. consumers touting Hailuo AI's ability to infringe Plaintiffs' Copyrighted Works.

j.    MiniMax has further targeted consumers in the United States, California, and this District by hosting a generative AI "meetup" in conjunction with the California-based company fal.ai.

---

[1] *See* U.S. Trademark Application Serial No. 98/825,674 (filed Oct. 29, 2024), https://tsdr.uspto.gov/#caseNumber=98825674.

k.     MiniMax has targeted and seeks to compete with Plaintiffs who reside in this District by promoting and advertising itself as "a Hollywood Studio in your pocket."

l.     As recently as September 2025, MiniMax has distributed infringing copies, reproductions, and derivatives of Plaintiffs' Copyrighted Works to MiniMax's subscribers in the United States, California, and this District. On information and belief, during the entire relevant period, MiniMax has distributed infringing copies, reproductions, and derivatives of Plaintiffs' Copyrighted Works to subscribers in the United States, California, and this District.

m.     Finally, MiniMax's unauthorized exploitation of the Copyrighted Works has caused harm to Plaintiffs in California and this District. MiniMax reasonably expected or should have reasonably expected its acts to cause harm in California and this District because Plaintiffs maintain either headquarters or offices in California, and it is the location of a significant portion of Plaintiffs' production and distribution operations.

37.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1391(c) because a substantial part of the events giving rise to the claims have occurred in this District and under 28 U.S.C. § 1400(a) because this District has personal jurisdiction over MiniMax, as alleged above.

## FACTUAL BACKGROUND

**A.     Plaintiffs Have Created and Own Some of the Most Popular Movies and Television Shows of All Time.**

38.     Disney, Warner Bros. Discovery, and Universal have a long and storied history of entertaining and inspiring audiences worldwide. Plaintiffs have created, developed, and produced some of the most enduring, valuable, and famous copyrighted entertainment properties in film, television, books, consumer products, theme parks, and other experiences.

39.     A driving force behind the success of Plaintiffs' entertainment properties are the imaginative and beloved copyrighted characters that appear in those Copyrighted

Works. Many of Plaintiffs' memorable characters have become pillars of pop culture with a lasting impact on generations of audiences and consumers.

40. Plaintiffs' characters span across the numerous entertainment properties that they own and exploit from Superman to Princess Elsa to Boss Baby. These original characters are central to the entertainment properties in which they appear. Plaintiffs' copyright registrations for those properties encompass those characters.

### 1. The *Star Wars* Characters

41. The *Star Wars* franchise began in 1977 with the release of the film *Episode IV: A New Hope*. The franchise is an epic space odyssey that spans multiple eras across three sets of film trilogies, multiple standalone motion pictures and specials, numerous live-action and animated television series, live theatrical productions, interactive video games, novels, theme park attractions, and comic books. Disney owns the copyrights to the *Star Wars* entertainment properties.

42. The *Star Wars* franchise is one of the most commercially successful franchises in entertainment history. As of 2020, five of the *Star Wars* movies have each earned over $1 billion at the global box office. *Star Wars: The Rise of Skywalker*, the most recent film in the franchise, reached this mark in only 28 days.

43. The *Star Wars* franchise is built upon numerous key characters that have expressive conceptual and physical qualities that make them distinctive and immediately recognizable. For example, Darth Vader is the iconic villain from the original *Star Wars* trilogy. Darth Vader is known for his black robes, dark powers, and signature black mask and helmet. Yoda, is the small, green, humanoid alien and Jedi Master in the *Star Wars* franchise. He is old, wise, has distinctive ears, and wears a robe. The Stormtroopers are the iconic military soldiers for the Galactic Empire and its leaders, including Darth Vader. The Stormtrooper's distinguishable uniform consists of white armor on top of a black underlayer and a striking white helmet. The Clone Troopers are soldiers that served as the military for the Galactic Republic. The Clone Trooper's distinguishable uniform typically consists of white plates of armor over a soft black layer and features a unique T-shaped

1   visor.  In some portrayals, different ranks and units of Clone Troopers are denoted using
2   different colors of markings on their armor.

3       44.    The *Star Wars* franchise includes several other iconic central characters like
4   the droids R2-D2 and C-3PO, the Wookiee Chewbacca, and many more.

5       45.    Disney's copyright registrations for the entertainment properties in its *Star*
6   *Wars* franchise encompass the central characters therein.

7               **2.    The Marvel Characters**

8       46.    The Marvel works and characters are part of one of the largest collections of
9   entertainment properties that exist in the same shared universe.  The origins of the Marvel
10  works and characters are the superheroes from comic books published by Marvel Comics.
11  The Marvel characters and storylines have grown considerably over time and are featured
12  in numerous blockbuster feature films, television series, specials, short films, books, video
13  games, art exhibits, theme park attractions, and, of course, comic books.  Disney owns the
14  copyrights to these Marvel entertainment properties.

15      47.    Disney's Marvel Cinematic Universe, which includes films based on the
16  Marvel characters, is the highest-grossing film franchise of all time.  All thirty-six films in
17  the franchise have opened number one at the domestic weekend box office.

18      48.    There are numerous superheroes and other characters in the Marvel works.
19  These characters have expressive conceptual and physical qualities that make them
20  distinctive and immediately recognizable.  The superhero Iron Man first appeared in
21  Marvel Comics in 1963, and in 2008 was featured in the blockbuster motion picture *Iron*
22  *Man*.  Iron Man is the alter ego of eccentric billionaire businessman and engineer Tony
23  Stark.  To transform into Iron Man, Stark dons his Iron Man suit made of distinguishable
24  red and gold armor that glows white over his heart and includes a red and gold mask.

25      49.    The Incredible Hulk (sometimes called "The Hulk") first appeared in Marvel
26  Comics in 1962.  The Hulk originated when Dr. Robert Bruce Banner was accidentally
27  exposed to gamma rays after an experimental bomb exploded.  As a result of the gamma
28

ray exposure, when Banner experiences emotional stress, he transforms into The Hulk, a large, green, super muscular humanoid with extreme physical strength and anger.

50.     Spider-Man first appeared in Marvel Comics in 1962.  In the comics, high-schooler Peter Parker became Spider-Man after he developed superhuman spider powers from being bitten by a radioactive spider.  Spider-Man wears a distinctive red and blue suit with spider web markings and spider-based eyes.

51.     The Marvel works include numerous other iconic central characters like Deadpool, Groot from Guardians of the Galaxy, the X-Man Wolverine, and Captain America.  Disney's copyright registrations for the Marvel works encompass the central characters therein.

### 3.     *The Simpsons* Characters

52.     The television series *The Simpsons* debuted in 1989 and has become the longest-running scripted primetime television series in American history.  The series is produced by 20th Century Studios, which was acquired by Disney approximately five years ago.  *The Simpsons* follows a family of five through their hijinks in the fictional town of Springfield.  In addition to the television series, *The Simpsons* franchise includes a movie, comic books, video games, and books.  Disney's 20th Century Studios owns the copyrights to the works in *The Simpsons* franchise.

53.     *The Simpsons* franchise is built upon several key main characters.  These characters have expressive conceptual and physical qualities that make them distinctive and immediately recognizable.  Visually, characters in *The Simpsons* franchise are distinct due to the animation style featured on the show.  The namesake family of five consists of Homer and Marge and their three children Bart, Lisa, and Maggie.  Bart Simpson, for example, is a mischievous troublemaker who wears blue shorts and an orange-red shirt and has signature spiked hair.  The father, Homer Simpson, is a loveable goof with a penchant for donuts, wears blue pants with a white top, and has two signature strands of hair.

54.     Disney's copyright registrations for the entertainment properties in *The Simpsons* franchise encompass the central characters therein.

### 4.    The Pixar Works and Characters

55.    Pixar is an animation studio that has produced dozens of critically acclaimed and commercially successful computer-animated films. In 1995, Pixar released *Toy Story*, which became an overnight sensation and box office success, grossing over $350 million worldwide. Since then, the Pixar works have expanded to include several highly successful motion picture franchises and standalone films including *Monsters, Inc.*, *Cars*, and *The Incredibles*. Additionally, the characters from the Pixar works appear in several theme park attractions, experiences, and consumer products. Disney owns the copyrights to the Pixar entertainment properties.

56.    The Pixar entertainment properties have achieved both commercial and critical success. Eight of Pixar's films have surpassed the $1 billion mark at the worldwide box office, something only eleven animated films have ever done. In addition, Pixar's films have won eighteen Academy Awards and received forty-nine nominations.

57.    The Pixar works feature numerous, highly expressive copyrighted characters adored by fans. Buzz Lightyear, for example, is a central character in the *Toy Story* franchise. He is a superhero action figure that wears a green and white spacesuit with a clear dome-shaped helmet and expandable wings. Lightning McQueen is an anthropomorphic stock car and the main character in the *Cars* franchise. He is a red race car with a yellow lightning bolt on his sides along with the number 95.

58.    Disney's copyright registrations for the Pixar entertainment properties encompass the central characters therein.

### 5.    Disney Classic Animation Characters

59.    Animated cartoons have been a bedrock in Disney's intellectual property portfolio since the 1920s. Classic animation has delighted and entertained generations of audiences.

60.    In 1937, Disney released its first animated feature film, *Snow White and the Seven Dwarfs*. The movie was the highest-grossing film for over five decades and ushered in a golden age of animation. Since the release of *Snow White*, Disney has released

numerous successful animated feature films such as *Peter Pan*, *The Little Mermaid*, *The Lion King*, *Frozen*, and *Mulan*. Disney holds the copyrights to each of these feature films along with several sequels, television series, short films, books, and other works in these franchises and Disney's classic animation universe.

61.     Disney's classic animation properties feature some of the world's most beloved characters including Princess Elsa and Olaf from *Frozen*, Ariel from *The Little Mermaid*, Jasmine and Aladdin from *Aladdin*, Mulan from *Mulan*, Lilo and Stitch from *Lilo & Stitch*, and Snow White from *Snow White*.

62.     The iconic central characters in Disney's classic animation properties have expressive conceptual and physical qualities that make them distinctive and immediately recognizable. Elsa, for one, is a princess with the ability to control ice and snow, who wears a glittering blue dress and has flowing, light blond hair. Stitch, for another, is a mischievous blue extraterrestrial with large floppy ears, a round black nose, and black eyes.

63.     Disney's copyright registrations for its classic animation entertainment properties encompass the central characters therein.

### 6.     The DC Comics Characters

64.     The DC Comics works and characters are part of one of the largest collections of entertainment properties that exist in the same shared universe. The origins of the DC Comics works and characters are superheroes from comic books originally published by DC Comics (including predecessors) starting in 1936. The DC Comics characters and storylines have grown considerably over time and are featured in numerous blockbuster feature films, television series, short films, video games, theme park attractions, and, of course, comic books. Warner Bros. Discovery owns the copyrights to these DC Comics entertainment properties.

65.     Warner Bros. Discovery's DC Comics universes, which include films based on the DC Comics characters, have achieved enormous commercial success. The DC Extended Universe, which encompasses films from 2018 through 2023, grossed over $7.14

1
2   billion in total at the global box office, with each film earning an average gross of $479 million.

3   66.   There are numerous superheroes and other characters in the DC Comics
4   works. These characters have expressive conceptual and physical qualities that make them
5   distinctive and immediately recognizable.

6   67.   Superman is the quintessential superhero, and one of the most enduring
7   superheroes in popular culture. Superman was first introduced in DC Comics in 1938 and
8   has most recently been featured in the film *Superman*, which was released domestically on
9   July 11, 2025 and is still in theatres. *Superman* grossed $125 million domestically in its
10  opening weekend, making it the third-most-successful opening of the year so far.
11  Superman's alter ego is Clark Kent, who resides in the city of Metropolis. When Clark
12  Kent transforms into Superman to fight crime, he typically dons a blue bodysuit that
13  emphasizes his muscular physique, red trunks, red boots, a yellow belt, and a long red cape.
14  Most importantly, Superman's suit features his unmistakable logo emblazoned on his
15  chest, which features a red "S" inside a red and yellow shield. Superman has superhuman
16  speed and reflexes. Throughout the DC Comics universes, Superman has been portrayed
17  both as a live-action and animated superhero, and has appeared across various films,
18  television series, comic books, and video games.

19  68.   The superhero Batman is an iconic fictional character who first appeared in
20  the DC Comics anthology series Detective Comics in 1939 and was more recently featured
21  in the 2022 film *The Batman*, the seventh highest-grossing film of the year. By day,
22  Batman's alter ego Bruce Wayne is a playboy billionaire, but by night, he fights crime in
23  his distinctive Batsuit, which features a bat-inspired mask, yellow utility belt, and Batman
24  emblem on the chest. Throughout the DC Comics universes, Batman has been portrayed
25  both as a live-action and animated superhero, and has appeared across various films,
26  television series, comic books, and video games.

27  69.   The supervillain the Joker is Batman's archenemy. The Joker typically wears
28  a purple suit and has stark white skin, green hair, and a wide, dramatic smile often with

bright red lips.  The Joker was introduced by DC Comics in a 1940 and was recently featured in the 2024 film *Joker: Folie à Deux*.  Throughout the DC Comics universes, the Joker has been portrayed both as a live-action and animated character.

70.    Flash is a distinctive and popular superhero character known for his superhuman speed, which he can use to generate lightning.  Flash wears a red suit and mask with gold lightning bolt-shaped ear and a lightning bolt emblem on the chest.  Flash first appeared in a comic book published by DC Comics in a 1940 and more recently in the 2023 film *The Flash*.  Throughout the DC Comics universes, Flash has been portrayed both as a live-action and animated character.

71.    Wonder Woman is another central superhero in the DC Comics works who debuted in 1941.  She is an Amazonian warrior from the fictional Themyscira who wears a distinctive blue and red outfit with a tiara, bracelets and her Lasso of Truth.  Wonder Woman has starred in numerous television and film projects over the decades including the 1970s television show *Wonder Woman* and more recently in the 2020 film, *Wonder Woman 1984*. Throughout the DC Comics universes, Wonder Woman has been portrayed both as a live-action and animated character.

72.    Warner Bros' *Teens Titans Go!* is a comedic animated series that first broadcast in 2013 that follows teenage versions of superheroes from the DC Comics universe.   The team includes teenaged Beast Boy, Robin, Cyborg, Raven, and Starfire. *Teen Titans Go!* and the characters therein, have a distinctive animation style, outfits, and visual appearance.

73.    Warner Bros. Discovery's copyright registrations for the DC Comics works encompass the central characters therein.

### 7.    *Looney Tunes* Characters

74.    The animated franchise *Looney Tunes* was first released as a series of animated theatrical short films beginning in 1930.  The franchise has spawned numerous television series that are still broadcast today.   The franchise also includes televisions specials, films, comic books, theme park attractions, and video games.

75.     Many of the *Looney Tunes* characters are ubiquitous household names, and these characters have expressive conceptual and physical qualities that make them distinctive and immediately recognizable.  Bugs Bunny, for example, is a playfully irreverent anthropomorphic gray and white rabbit, who has a star on the Hollywood Walk of Fame.  Bugs Bunny has an overbite that showcases his two long front teeth, oversized feet with white fur, and is often depicted eating a carrot.

76.     Other major *Looney Tunes* characters include Daffy Duck, a black duck with an orange beak and orange feet, and a white ring around his neck; Sylvester the Cat, an anthropomorphic tuxedo cat with a bulbous red nose and hairy white cheeks; and Tweety, a yellow canary bird with baby blue eyes, long eyelashes, chubby cheeks, and oversized orange feet.  Sylvester the Cat is often portrayed chasing Tweety.

77.     Warner Bros. Discovery's copyright registrations for the entertainment properties in the *Looney Tunes* franchise encompass the central characters therein.  Warner Bros. Discovery owns the copyrights to the *Looney Tunes* properties.

### 8.     *Tom and Jerry*

78.     *Tom and Jerry* is a classic animated short film franchise originally created in 1940.  Since then, numerous spinoffs have been released in the form of television shows, feature films, comic books, comic strips, video games, and a staged musical.  Seven *Tom and Jerry* short films have won the Academy Award for Best Animated Short Film.  In 2021, *Tom and Jerry* was released as a hybrid live-action and animated film in theatres and via HBO Max.

79.     The characters in *Tom and Jerry* have expressive conceptual and physical qualities that make them distinctive and immediately recognizable.  Tom is a gray, anthropomorphic tuxedo cat, and Jerry is a small brown anthropomorphic mouse.  Tom and Jerry's creators characterized the duo as "the best of enemies," in a nod to their antagonistic yet caring relationship.  Tom is often depicted chasing Jerry and ultimately failing to capture him.

80.    Warner Bros. Discovery's copyright registrations for *Tom and Jerry* encompass the central characters therein.  Warner Bros. Discovery owns the copyrights to the *Tom and Jerry* properties.

### 9.    *Scooby-Doo*

81.    *Scooby-Doo* is a media franchise that features four teenagers and their cowardly but loveable Great Dane, Scooby-Doo, who travel around in their distinctive van, the Mystery Machine, and solve spooky mysteries.  *Scooby-Doo* was first released as an animated television series in 1969, and the franchise has been refreshed in various television series, including as recently as 2021.   A live-action series is currently in development for release on Netflix.  The *Scooby-Doo* characters have also been featured in films, comic books, theme park attractions, and tabletop games.

82.    The characters in the *Scooby-Doo* media franchise have expressive conceptual and physical qualities that make them distinctive and immediately recognizable.

83.    Scooby-Doo is an animated Great Dane who is brown with black spots on his back and shoulders.  Scooby-Doo wears a teal collar with a gold-trimmed teal tag that bears his initials, "SD."  He has a large, black, triangular nose, thick eyebrows, rounded upright ears, and small spots on his cheeks.

84.    Warner Bros. Discovery's copyright registrations for *Scooby-Doo* encompass the central characters therein.  Warner Bros. Discovery owns the copyrights to the *Scooby-Doo* properties.

### 10.    The Cartoon Network Characters

85.    The Cartoon Network is a cable television network that broadcasts animated television series ranging from action to comedy for both children and adults.  The Cartoon Network owns the copyrights to many popular American cartoons including *The Powerpuff Girls* and *Rick and Morty*.

86.    *The Powerpuff Girls* is an animated television series that features three kindergarten-aged girls, Blossom, Bubbles, and Buttercup, who fight crime in the fictional city of Townsville.  The franchise originated in 1992 with the introduction of the three

characters in a cartoon short and became a full television series in 1998. The series received a reboot in 2016. The franchise also includes television specials, films, anime adaptations, comic books, video games, and consumer products.

87.    The Powerpuff Girls have expressive conceptual and physical qualities that make them distinctive and immediately recognizable. The Powerpuff Girls are small, animated girls with oversized heads, large round eyes, and small, rounded features. They have small, simple mouths, and no noses or necks. The Powerpuff Girls have superpowers including the ability to fly.

88.    All three characters wear a color blocked dress with a black stripe, white stockings, and black Mary Jane shoes, and have eyes the same color as their outfits. Blossom has orange hair and wears pink. Bubbles is blond and wears blue. Buttercup has black hair and wears green.

89.    The Cartoon Network's copyright registrations for *The Powerpuff Girls* encompass the central characters therein. The Cartoon Network owns the copyrights to *The Powerpuff Girls* properties.

90.    *Rick and Morty* is an adult animated television series released under Cartoon Network's "Adult Swim" brand. *Rick and Morty* features two titular characters: mad scientist Rick Sanchez, and his gullible and anxious grandson Morty Smith. *Rick and Morty* was initially released in 2013 and has consistently received high viewer ratings and critical acclaim. The series has been nominated for many awards, and has won multiple Emmy and Annie Awards, among others. *Rick and Morty* characters have been featured in short spinoff series and comic books and have made cameo appearances in other films and television series, including *The Simpsons*.

91.    The characters in *Rick and Morty* have expressive conceptual and physical qualities that make them distinctive and immediately recognizable. Rick Sanchez is an animated eccentric mad scientist with spiky, baby-blue hair, and a unibrow of the same color. He has grayish skin and large eyes, and typically wears a blue shirt and a long, white lab coat. He also wears brown trousers over his pencil-thin legs. Morty Smith is an

animated 14-year-old boy with brown hair and bulbous eyes.  He typically wears a plain yellow t-shirt and blue trousers.  The duo is often pictured traveling in their Space Cruiser or traveling through the universe using glowing, bright green portals.

92.    The Cartoon Network's copyright registrations for *Rick and Morty* encompass the central characters therein.  The Cartoon Network owns the copyrights to the *Rick and Morty* properties.

## 11.    Universal Pictures' Minions Characters

93.    The *Despicable Me* franchise began in 2010 with Universal Pictures' release of the original *Despicable Me* film.  The *Despicable Me* franchise is not only the highest-grossing animated film franchise of all time, but it is also among the highest-grossing of any film franchises of all time, having grossed over $5 billion since 2010.  The *Despicable Me* franchise has spawned four main feature films, a *Minions* three-film prequel series, 20 short films, a holiday television special, a *Saturday Morning Minions* digital series consisting of forty episodes, several video games, and theme park attractions in Universal Studios Hollywood, located in this District, as well as theme parks in Florida and throughout Asia.

94.    The *Despicable Me* franchise is built upon numerous key characters that have expressive conceptual and physical qualities that make them distinctive and immediately recognizable.  One of the most ubiquitous and recognizable characters from the franchise is the Minion.  Minions were first introduced in *Despicable Me* as members of the army of the film's antagonist, Felonious Gru, but quickly achieved fame on their own, and eventually became the main characters in the *Minions* spin-off film series.

95.    Minions are instantly recognizable due to their distinctive capsule shape and yellow color.  Minions have one or two brown eyes, sparse black or no hair, and lack visible noses and ears.  Minions wear black gloves and metal goggles, and often wear denim overalls that sometimes feature Gru's logo on the pocket.

96.    Universal Pictures' copyright registrations for the *Despicable Me* franchise encompass the central characters therein, including the Minions.

### 12.    DreamWorks Characters

97.    Universal's DreamWorks animation studio has released 50 films and over 50 television series in its 30 years, making it one of the largest animation production companies in the world. DreamWorks films and television shows are critically acclaimed, and have received Academy Awards, Emmy Awards, and Golden Globe Awards. DreamWorks has also received awards for being an industry leader in technological innovations.

98.    The *Shrek* franchise is among DreamWorks' most successful ventures. DreamWorks has released four *Shrek* feature films, with *Shrek 5* slated for release next year. The *Shrek* franchise also consists of short films, theme park attractions, television specials, video games, comic books, spin-off films based on the Puss in Boots character, and a Broadway musical. *Shrek* is the second highest-grossing animated film franchise of all time, after Universal's *Despicable Me*.

99.    *Shrek*'s namesake character is a large, bald, dull-green ogre with a broad, round face, brown eyes, and highly distinctive trumpet-shaped ears. Shrek typically wears crude clothing consisting of a canvas-like shirt, a leather vest, and brown leggings.

100.    Puss in Boots is a small, charismatic orange tabby cat with a penchant for drama, who originally appeared in the *Shrek* franchise before receiving his own film series. Puss in Boots is a swashbuckling swordsman who is usually pictured carrying his rapier and wearing a black wide-brimmed hat with an oversized feather, knee-high boots, and a belt. He is known for his large, expressive green eyes.

101.    The *How to Train Your Dragon* franchise began with the release of the first of three animated films, *How to Train Your Dragon*, in 2010. Since 2010, the franchise has grossed over $1.6 billion worldwide, and has received overwhelmingly positive critical reviews. The *How to Train Your Dragon* franchise has won Golden Globe Awards and been nominated for Academy Awards. In addition to the three original animated films, Universal released a live-action remake of *How to Train Your Dragon* on June 16, 2025, with a *How to Train Your Dragon 2* remake expected in 2027. The franchise also consists

of the *DreamWorks Dragons* television series, short films, video games, comic books and graphic novels, live performance adaptations, and theme park attractions.

102.   The *How to Train Your Dragon* franchise is built upon several key main characters.  These characters have expressive conceptual and physical qualities that make them distinctive and immediately recognizable.  The protagonist of the franchise, Hiccup Horrendous Haddock III, or "Hiccup," is a scrawny, teenage Viking boy, with medium-length tousled hair and green eyes.  Hiccup often wears armor made of dark brown leather.  Toothless is the dragon who belongs to Hiccup in the franchise.  Toothless has a sleek body covered in matte, jet-black scales, with bat-like wings and a long tail.  He is a medium-sized, aerodynamic dragon, with pointy black ears that are pointed backwards.  Toothless has a short, rounded muzzle, with large, cat-like green eyes.

103.   The *Kung Fu Panda* franchise began with DreamWorks' release of the 2008 animated film of the same name.  The original *Kung Fu Panda* had the highest-grossing opening for any DreamWorks non-sequel film; other than *Shrek,* its domestic box office revenue was also the highest of all non-sequel DreamWorks films until *How to Train Your Dragon* was released in 2010.  Today, the *Kung Fu Panda* franchise extends to video games, an interactive theme park experience, a live show, short films, and television series.

104.   The franchise follows a giant animated panda, Po Ping, or "Po," as he is chosen to be the legendary Dragon Warrior and seeks to become a Kung Fu master.  Po is depicted as a rotund, animated panda, who initially struggles to become proficient in Kung Fu but ultimately grows into his own unique fighting style motivated by his love of food, and leans into his bulky physique to become a skilled martial artist.

105.   Po is portrayed as a chubby, anthropomorphic panda with a white face, black ears, and black fur around his eyes.  Po's upper body and arms are covered with black fur, while his torso is covered with white fur.  Po wears brown burlap pants that have a waistband of vertical dark red and yellow stripes.  Po also wears shoes that are intended to look like panda toes.

106.    The *Trolls* franchise began in 2016 with the release of the namesake film *Trolls*.    The franchise is built off of two central troll characters, Poppy and Branch, who live in a village of pop-singing trolls.    The franchise includes three feature films, two holiday televisions specials, and two animated series.    The trolls are colorful and happy animated characters who enjoy singing and dancing.    Poppy is a small, pink troll with bright pink hair who typically wears a blue floral dress and a flower crown.    Branch is a blue troll with spiky blue hair, who typically wears a vest made of leaves and shorts, and is often shown as more skeptical or concerned than Poppy.

107.    *The Boss Baby* film franchise began with the 2017 animated film of the same name.    The franchise also includes two television series, two short films, and an interactive special.    The franchise has been praised for its adult humor despite being in an animation format and was nominated for Academy and Golden Globe Awards.    *The Boss Baby* earned over $500 million at the box office worldwide.

108.    *The Boss Baby*'s titular character, "Boss Baby," also known as "Theodore Templeton Jr." or simply "Ted," is an infant who speaks and carries himself like an adult when parents and adults are not around.    Ted is visually distinct and deliberately designed to contrast the cuteness of a baby with the seriousness of a corporate executive.    Ted has an oversized, round baby head with a high forehead, green eyes and blonde hair that forms a widow's peak.    Ted is usually portrayed wearing a full suit, or just a diaper.

109.    Universal's copyright registrations for its DreamWorks entertainment properties encompass the central characters therein.

**B.    MiniMax Infringes Plaintiffs' Intellectual Property.**

**1.    MiniMax's Business of Providing AI Services.**

110.    Unbeknownst to Plaintiffs, MiniMax was founded in 2021 and received backing from Chinese companies and investors.    MiniMax develops, operates, and sells its generative AI services, including Hailuo AI.    MiniMax is a successful enterprise that, in

January 2025, was reported to have raised $850 million in venture capital[2] and is now reportedly valued at $4 billion for its initial public offering.[3]

111.   MiniMax's Hailuo AI is a commercial service.   Currently, subscribers can access Hailuo AI by signing up for a subscription on MiniMax's website.[4]  MiniMax offers six different subscription levels, as shown below:



---

[2] *See* Kyle Wiggers, *Chinese AI Company Minimax Releases New Models It Claims Are Competitive With The Industry's Best*, TECHCRUNCH (Jan. 15, 2025), https://techcrunch.com/2025/01/15/chinese-ai-company-minimax-releases-new-models-it-claims-are-competitive-with-the-industrys-best/; Pei Li, Julia Fioretti, and Luz Ding, *Alibaba-Backed 'AI Dragon' MiniMax Plans Hong Kong IPO*, BLOOMBERG (June 18, 2025), https://www.bloomberg.com/news/articles/2025-06-18/alibaba-backed-ai-dragon-minimax-is-said-to-plan-hong-kong-ipo.

[3] Tracy Qu and Raffaele Huang, *Alibaba-Backed Chinese Startup Files for Hong Kong IPO*, THE WALL STREET JOURNAL (July 16, 2025), https://www.wsj.com/finance/chinese-ai-startup-minimax-files-for-hong-kong-ipo-sources-say-bbc88c91?reflink=desktopwebshare_permalink.

[4] *See* Subscription Plans, Hailuo AI, https://hailuoai.video/subscribe.

112.   MiniMax's five levels of paid subscriptions range from $9.99 per month to $199.99 per month.  Subscribers can receive a discount of 40–43% on monthly pricing by paying for quarterly subscription and a discount of 47–49% by paying for an annual subscription.

113.   While the introductory level subscription is free, subscribers must still register an account, and a free subscriber's use of Hailuo AI is limited, which encourages the user to become a paid subscriber.  For example, a subscriber with a free account receives 500 credits upon signing up (which expire if not used within three days).   According to MiniMax, each image generation costs one credit (with a default of four images generated per prompt) and each six second video generation costs 25 credits.  Therefore, once a free account holder uses or loses their 500 sign-up credits, the subscriber must upgrade their membership to a paid plan if they wish to generate additional images or videos.  MiniMax also applies a watermark of its logo to many videos and images generated by its Hailuo AI service, allowing it to further advertise and promote its commercial service.  Users with paid subscriptions have the option to remove watermarks from Hailuo AI outputs, but users with free subscriptions do not.  MiniMax recently introduced its top-tier "Max" plan which, for $199.99 per month, allots users 20,000 credits per month, and "[u]nlimited usage of the Hailuo 01/02 model" to generate videos in slow mode, regardless of available credits.

114.   Subscribers with paid accounts get (a) more credits, (b) the ability to process multiple generations at once (what MiniMax calls "Fast-track generation"), and (c) the ability to remove MiniMax's watermark logo from their videos and images.  By providing additional benefits to paid subscribers (in addition to limiting use for free subscriptions as noted above), MiniMax further encourages its subscribers to become paid subscribers.

115.  Copies of the videos generated by MiniMax for its subscribers are also publicly displayed and performed on the "Explore" page on MiniMax's website.  MiniMax's Explore page is a prominent feature of its website that advertises the videos

and images that Hailuo AI has generated.  The Explore page is one of many ways MiniMax promotes its Hailuo AI and attracts subscribers to the service.

> 2.    **MiniMax Reproduces, Generates, Publicly Displays, Publicly Performs, and Distributes Reproductions and Derivative Works of Plaintiffs' Copyrighted Works.**

116.    Through its own affirmative conduct, including the selection of which Copyrighted Works will be stored by and made available through Hailuo AI, MiniMax directly reproduces, publicly displays, publicly performs, and distributes reproductions and derivative works of Plaintiffs' content.

117.    The examples below confirm that MiniMax directly produces video and image outputs that infringe on Plaintiffs' copyrighted characters.

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

///

---

COMPLAINT

118.    MiniMax consistently and accurately reproduces, publicly displays, publicly performs, and distributes copies and derivatives of characters from Disney's *Star Wars* franchise to its subscribers.   In response to the simple request (often referred to as a "prompt") asking to see a "Storm Trooper running into battle," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Disney's Stormtroopers, as shown in these screenshots:



/// 
/// 
/// 
/// 
/// 
///

119.   In response to the simple request asking to see "Clone Troopers walking around a spaceship," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Clone Troopers, as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
| --- | --- |
|  |  |

///
///
///
///
///
///
///
///
///

120.    In response to the prompt "Yoda with lightsaber, IMAX," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Yoda, as shown in this screenshot:



| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|

///
///
///
///
///
///
///
///
///
///

121.    In response to the prompt "R2-D2 and C-3PO walking near a spaceship, movie scene," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, and made available for download an image output that reproduces Disney's R2-D2 and C-3PO characters, as shown below:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|



///

///

///

///

///

122.   In response to the prompt, "Darth Vader walking around the Death Star with a red lightsaber," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Darth Vader, as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|
|  | |

///
///
///
///
///

1    123.    In response to the prompt, "Darth Vader and Yoda sitting at a table having a
2    drink together," MiniMax used the data about Disney's Copyrighted Works that is
3    embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly
4    performed, and made available for download a video output that reproduces Disney's Darth
5    Vader and Yoda, as shown in this screenshot:



| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|

19    ///
20    ///
21    ///
22    ///
23    ///
24    ///
25    ///
26    ///
27    ///
28

124. In response to the prompt, "Mandalorian carrying Baby Yoda," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's The Mandalorian and Grogu (sometimes referred to as Baby Yoda), as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
| --- | --- |
|  |  |

125. MiniMax consistently reproduces, publicly displays, and distributes copies and derivatives of characters from *The Simpsons* to its subscribers. In response to the prompt, "Bart Simpson riding a skateboard down the street," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, and made available for download an image output that reproduces Disney's Bart Simpson, as shown below:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|
|  | |

126.  In response to the prompt, "homer simpson cartoon character at work," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, and made available for download an image output that reproduces Disney's Homer Simpson, as shown below:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|
|  | |

127.   MiniMax consistently and accurately reproduces, publicly displays, publicly performs and makes available for download copies and derivatives of Disney's Marvel characters to its subscribers.  In response to the prompt, "Iron Man flying over New York City," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Disney's Iron Man character, as shown in these screenshots:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|
|  |  |

///

///

///

///

///

128.　In response to the prompt, "Deadpool raising his swords," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Deadpool character, as shown in this screenshot:



| MiniMax Output | Disney's Copyrighted Character(s) |

///
///
///
///
///
///
///
///
///

129.   In response to the prompt, "Spider Man swinging between buildings with his web," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Spider-Man character, as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|
|  |  |

130.    In response to the prompt, "Baby Groot walking around the forest," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, and made available for download an image output that reproduces Disney's Baby Groot character, as shown below:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|
|  |  |

///
///
///
///
///
///
///
///
///
///
///
///
///
///
///

131.  MiniMax consistently and accurately reproduces, publicly displays, and makes available for download copies and derivatives of characters from Disney's Pixar entertainment properties to its subscribers.   In response to the prompt, "Buzz Lightyear flying around bedroom, Toy Story, animated movie scene," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Buzz Lightyear, as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|
|  | |

///
///
///
///
///

132.   In response to the prompt, "Lightening McQueen crossing the finish line," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Lightening McQueen character, as shown in this screenshot:



| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|

///
///
///
///
///
///
///
///
///

1        133.   In response to the prompt, "Wall-E rolling around a pile of trash, animated

2  movie scene," MiniMax used the data about Disney's Copyrighted Works that is embodied

3  within the Hailuo AI model and then reproduced, publicly displayed, publicly performed,

4  and made available for download a video output that reproduces Disney's Wall-E

5  character, as shown in this screenshot:



19  ///
20  ///
21  ///
22  ///
23  ///
24  ///
25  ///
26  ///
27  ///
28

134.   In response to the prompt, "Mike Wazowski and Sully in a child's bedroom, Monsters, Inc.," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Sulley and Mike Wazowski characters, as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|



135.   MiniMax consistently and accurately reproduces, publicly displays, and makes available for download copies and derivatives of characters from Disney's classic animation entertainment properties to its subscribers.  In response to the prompt, "Princess Elsa singing in front of an ice castle, Frozen animated movie," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Princess Elsa character, as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|



136.    In response to the prompt, "Olaf from Frozen dancing in the snow," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Olaf character from *Frozen*, as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|



137.   In response to the prompt, "Ariel and Flounder under the sea, cartoon," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Disney's Ariel and Flounder, as shown in this screenshot:

| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|
|  | |

/// 

///

///

///

///

///

///

138.   In response to the prompt, "Simba and Nala standing on Pride Rock, Lion King," MiniMax used the data about Disney's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, and made available for download an image output that reproduces Disney's Simba and Nala, as shown below:



| MiniMax Output | Disney's Copyrighted Character(s) |
|---|---|

139.   In addition to the characters above, MiniMax consistently and accurately reproduces, publicly displays, publicly performs, and distributes copies and derivatives of other Disney characters, including the titular characters from Disney's *Mulan* and *Moana* franchises.

///

///

///

///

140.    MiniMax consistently and accurately reproduces, publicly displays, publicly performs, and distributes copies and derivatives of characters from Warner Bros. Discovery's DC Comics properties to its subscribers.   In response to a prompt asking to see "Batman running down an alley in Gotham City, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Warner Bros. Discovery's Batman, as shown in these screenshots:



| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|

///

///

///

///

141. In response to a prompt asking to see "The Joker holding up a Joker playing card and laughing, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Warner Bros. Discovery's The Joker, as shown in this screenshot:

| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
| --- | --- |
|  |  |

142.   In response to prompts asking to see "The Flash running through Central City" and "The Flash running through Central City, animated 2d cartoon" MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download image and video outputs that reproduce Warner Bros. Discovery's Flash, as shown in these screenshots:

| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|
|  |  |
|  |  |
| |  |

143.   In response to prompts asking to see "Wonder Woman running through a battlefield" and "Wonder Woman running through a battlefield, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Warner Bros. Discovery's Wonder Woman, as shown in these screenshots:



| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|

144.    In response to a prompt asking to see "Superman flying over Metropolis with his arms outstretched, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download image and video outputs that reproduce Warner Bros. Discovery's Superman, as shown in this screenshot:

| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|
|  | |

///
///
///
///
///
///
///
///
///
///
///

145.   In response to prompts asking to see "The Teen Titans Go! Hanging out in Titans Tower" and "The Teen Titans Go! Hanging out in Titans Tower, animated 2d cartoon" MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Warner Bros. Discovery's Teen Titans Go! characters, as shown in these screenshots:

| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|
|  | |

///

///

COMPLAINT

146.   MiniMax consistently and accurately reproduces, publicly displays, and distributes copies and derivatives of characters from Warner Bros. Discovery's *Looney Tunes* properties to its subscribers.   In response to a prompt asking to see "Bugs Bunny eating a carrot in a grove of trees, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Warner Bros. Discovery's Bugs Bunny, as shown in this screenshot:



| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|

147.   In response to a prompt asking to see "Daffy Duck running through a forest, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Warner Bros. Discovery's Daffy Duck, as shown in this screenshot:



| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|

148.    In response to a prompt asking to see "Sylvester trying to eat Tweety through his bird cage, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Warner Bros. Discovery's Sylvester and Tweety characters, as shown in this screenshot:

| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|
|  |  |

///

///

///

///

///

///

///

///

///

///

///

149.   MiniMax consistently and accurately reproduces, publicly displays, publicly performs, and distributes copies and derivatives of characters from Warner Bros. Discovery's other animated properties to its subscribers. In response to a prompt asking to see "Jerry Mouse running away from Tom Cat in a living room, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Warner Bros. Discovery's Tom and Jerry characters, as shown in this screenshot:



| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|

///

///

///

150.   In response to a prompt asking to see "Scooby-Doo sneaking around a dark warehouse, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Warner Bros. Discovery's Scooby-Doo character, as shown in these screenshots:

| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|
|  |  |

///

///

///

///

///

151.    MiniMax consistently and accurately reproduces, publicly displays, publicly performs, and distributes copies and derivatives of characters from Warner Bros. Discovery's Cartoon Network properties to its subscribers. In response to a prompt asking to see "Powerpuff girls flying through the clouds," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Warner Bros. Discovery's Blossom, Buttercup, and Bubbles characters from *The Powerpuff Girls*, as shown in this screenshot:

| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|
|  |  |

///
///
///
///

152.   In response to prompts asking to see "Rick and Morty flying in their spaceship" and "Rick and Morty emerging from a wormhole, animated 2d cartoon," MiniMax used the data about Warner Bros. Discovery's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Warner Bros. Discovery's Rick Sanchez and Morty Smith characters from *Rick and Morty*, as shown in these screenshots:

| MiniMax Output | Warner Bros. Discovery's Copyrighted Character(s) |
|---|---|
|  |  |
|  |  |
| |  |

153.   MiniMax consistently and accurately reproduces, publicly displays, publicly performs, and distributes copies and derivatives of Universal Pictures' Minions characters from its *Despicable Me* properties to its subscribers.  In response to prompts asking to see "Minions" and "Minions from Despicable Me," MiniMax used the data about Universal's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Universal Pictures' Minions, as shown in these screenshots:

| MiniMax Output | Universal's Copyrighted Character(s) |
|---|---|



154.    MiniMax consistently and accurately reproduces, publicly displays, publicly performs, and distributes copies and derivatives of characters from its DreamWorks properties to its subscribers.  For example, in response to prompts asking to see "Shrek and Donkey talking to each other," "Shrek DreamWorks," and "Shrek and Donkey crossing a rickety bridge over lava," MiniMax used the data about Universal's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Universal's Shrek and Donkey, as shown in these screenshots:



COMPLAINT

155. In response to a prompt asking to see "Puss in Boots fencing dramatically on a tavern table," MiniMax used the data about Universal's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Universal's Puss in Boots character, as shown in this screenshot:



| MiniMax Output | Universal's Copyrighted Character(s) |
|---|---|

///
///
///
///
///
///
///
///
///

156.   In response to a prompt asking to see "Kung Fu Panda," MiniMax used the data about Universal's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Universal's Po character from *Kung Fu Panda*, as shown in this screenshot:

| MiniMax Output | Universal's Copyrighted Character(s) |
|---|---|
|  |  |

///
///
///
///
///
///
///

COMPLAINT

157.   In response to prompts asking to see "Poppy and Branch from Trolls," "Poppy from Trolls animated character," and "Branch singing solo on a mossy cliff in the Trolls world," MiniMax used the data about Universal's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download video outputs that reproduce Universal's Poppy and Branch characters from *Trolls*, as shown in these screenshots:



158.   In response to a prompt asking to see "The Boss Baby," MiniMax used the data about Universal's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Universal's Boss Baby character as shown in this screenshot:



159.   In response to a prompt asking to see "Hiccup and Toothless the Dragon soaring over cliffs at sunset," MiniMax used the data about Universal's Copyrighted Works that is embodied within the Hailuo AI model and then reproduced, publicly displayed, publicly performed, and made available for download a video output that reproduces Universal's Hiccup and Toothless characters from *How to Train Your Dragon*, as shown in this screenshot:



| MiniMax Output | Universal's Copyrighted Character(s) |
|---|---|
|  | |

160.   As shown above, the outputs created by MiniMax are substantially similar reproductions and derivative works of Disney's, Warner Bros.' Discovery, and Universal's valuable copyrighted characters. The outputs often contain extensive nuance and detail, background elements, costumes, and accessories beyond what was specified in the prompt. As explained below, MiniMax is able to reproduce, publicly display, publicly perform, and distribute these copies because MiniMax selected and copied Plaintiffs' Copyrighted Works as part of the training process for Hailuo AI.

### 3.   MiniMax Was Trained to Output Infringing Content.

161.   The fact that MiniMax reliably generates copies and derivatives of Plaintiffs' Copyrighted Works demonstrates that MiniMax, without Plaintiffs' knowledge or

permission, copied Plaintiffs' Copyrighted Works to train and develop Hailuo AI.  It also shows that Hailuo AI, through software programming and computer storage devices, embodies "copies" of those works, as that term is defined in Section 101 of the Copyright Act, in the AI software that powers Hailuo AI.   On information and belief, MiniMax, without Plaintiffs' knowledge, developed and trained Hailuo AI on copyrighted works, including Plaintiffs' Copyrighted Works, to help ensure that it is able to reproduce, publicly display, publicly perform, and distribute faithful, high-quality copies and derivative works of the works it trained on, including Plaintiffs' Copyrighted Works.

162.   Based on the facts and circumstantial evidence alleged in this Complaint and common knowledge about the process for creating a generative AI image and video services like MiniMax, Plaintiffs are informed and believe that MiniMax engaged in the following conduct to train Hailuo AI:

a.   *First*, MiniMax acquired the underlying works to be used to train the service.  To do so, MiniMax downloaded from the internet, and other sources, content using tools variously described as bots, scrapers, streamrippers, video downloaders, and web crawlers.  That content may have been obtained from pirate sources or repositories.  The data acquired and copied by MiniMax to use in training Hailuo AI includes Plaintiffs' Copyrighted Works.

b.   *Second*, to prepare the data for ingestion, MiniMax "cleaned" the copies of the underlying works that were collected in the previous step through a filtering process and reformatted (e.g., converted them to a common technical format) the copies that were not filtered out in the cleaning process to train Hailuo AI. This step necessarily included creating more copies of the materials obtained in the gathering phase, such as a new copy of each reformatted item (including Plaintiffs' Copyrighted Works).

c.   *Third*, MiniMax then used the collected and cleaned data and Copyrighted Works to "train" Hailuo AI. Although the specifics of this training phase have not been disclosed by MiniMax, and will be the subject of discovery in this action, MiniMax's ability to repeatedly use the data embodied within the Hailuo AI model to reproduce, publicly display, publicly perform, and distribute further copies of Plaintiffs' Copyrighted Works for its subscribers demonstrates that MiniMax's training of its generative AI model involved the fixation of copies of Plaintiffs' Copyrighted Works in a tangible medium from which the work can be perceived, reproduced, or otherwise communicated with the aid of a machine or device. On information and belief, and based on Hailuo AI's terms of use, MiniMax also trains on Hailuo AI outputs it has generated for subscribers. MiniMax's process of training and making multiple copies of Plaintiffs' Copyrighted Works was done without Plaintiffs' approval or authorization.

163. In other words, MiniMax uses software, servers, and other technology to store and fix data associated with Plaintiffs' Copyrighted Works in such a manner that those works are thereby embodied in the model, from which MiniMax is then able to generate, reproduce, publicly display, publicly perform, and distribute unlimited "copies" of Plaintiffs' works as defined by the Copyright Act.

164. To be clear, MiniMax had to copy Plaintiffs' Copyrighted Works in order for it to be able to subsequently disseminate reproductions and derivatives of Plaintiffs' Copyrighted Works as outputs. MiniMax's copying of Plaintiffs' Copyrighted Works was, at all times, unauthorized.

///

///

///

///

4.   **MiniMax's Public Display, Public Performance, and Distribution of Plaintiffs' Copyrighted Works Is Pervasive and Draws Consumers to the Hailuo AI Service.**

165.   Once the training process is complete, due to MiniMax's massive copying of Plaintiffs' Copyrighted Works, and as a direct and intentional result of Hailuo AI's development and training, Hailuo AI generates reproductions and derivatives of Plaintiffs' Copyrighted Works.   With its Hailuo AI service, MiniMax is able to further reproduce, publicly display, publicly perform, and distribute image and video outputs that are identical or virtually identical to Plaintiffs' Copyrighted Works in response to simple text-based prompts.

166.   As repeatedly shown above, the outputs created by Hailuo AI are copies and derivative works of Plaintiffs' valuable copyrighted characters.   In response to a prompt for an image or video of Spider-Man, Minions, Rick and Morty, or any of Plaintiffs' countless copyrighted characters, Hailuo AI creates yet another copy of that character which it publicly displays, publicly performs, and distributes by making the copy available for download.   These so-called outputs are copies and/or derivatives of Plaintiffs' copyrighted characters.   Hailuo AI thus can generate an endless supply of copies and derivative works that it can and does publicly display, publicly perform, and/or distribute to subscribers on demand.

167.   Indeed, like a virtual vending machine, MiniMax publicly performs, distributes, and displays copy after copy after copy of Plaintiffs' iconic copyrighted characters to its subscribers and then advertises the availability of this infringing content on its website as part of its promotional Explore feature.   MiniMax also advertises its infringing service and induces infringement of Plaintiffs' copyrights through streaming unauthorized videos with Plaintiffs' copyrighted characters on MiniMax's YouTube channel and its other promotional outlets such as Instagram and TikTok as detailed below.

168.   By publicly displaying, publicly performing, reproducing, distributing, and creating derivative works of Plaintiffs' Copyrighted Works, as described above and below,

MiniMax has directly infringed (and continues to directly infringe) Plaintiffs' exclusive rights as copyright holders, including the rights of reproduction, distribution, public display, public performance, and preparation of derivative works.

169.   Undeterred by U.S. copyright law, MiniMax openly advertises Hailuo AI's ability to infringe Plaintiffs' Copyrighted Works to draw subscribers to its service. MiniMax consistently advertises and promotes videos that Hailuo AI generated which copy Plaintiffs' Copyrighted Works.   For example, MiniMax's official YouTube channel promoted (and continues to promote) a video titled "Hailuo AI | Superheroes will heal your soul" which features many of Plaintiffs' characters including Deadpool, Batman, The Joker, Iron Man, Wonder Woman, Thanos, Superman, Groot, Black Panther, Spider-Man, Flash, Wolverine, and more as shown in the screenshots below.[5]



---

[5] *See* HAILUOAI, *Hailuo AI | Superheroes will heal your soul* (YouTube Nov. 18, 2024), https://youtu.be/9FZyRYDdgGY?si=UKp8XAaBP8HnbVQP.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



170.    MiniMax also encourages and induces subscribers to request and download videos featuring Disney and Warner Bros. Discovery's Copyrighted Works by conducting "paid partnerships" with subscribers.[6]  As shown below and as noted above, an Instagram post, tagged as a "paid partnership" with Hailuo AI shows numerous video clips of Disney's Copyrighted Works, that include Iron Man, Deadpool, Groot and Rocket Raccoon.

///
///
///
///
///

----

[6] Video posted by @neovisionary5, INSTAGRAM (May 19, 2025), https://www.instagram.com/p/DJ0821VM5dj/.

1

2

3

4

5

6

7

8

9

10

11

12

13



14

15

16

17

18

19

20

21

22

23

24



25

26

27

28



171.  The advertisement informs subscribers and potential subscribers that they can "open Hailuo AI" and then "just type what you want."  The video then shows a screen of Hailuo's video generator with "Spider-man and Supergirl kissing in the park" typed into the text to video prompt.

172. The advertisement then informs the viewer that they only have to "wait[] a short time and boom!" The result is a video of Disney's Copyrighted Work, Spiderman; and Warner Bros. Discovery's Copyrighted Work, Supergirl, kissing in front of a lake in the park.



///
///
///
///
///
///
///
///
///

173.    The advertisement ends with a call to action for consumers (subscribers and potential subscribers) to download the Hailuo AI app based on its ability to generate copies and derivatives of Plaintiffs' copyrighted characters.



///
///
///
///
///
///
///
///

COMPLAINT

174.   MiniMax posted an advertisement for Hailuo AI on its official WeChat social media account that featured Disney's Buzz Lightyear and Olaf from *Frozen*, as shown in the screenshot below.  WeChat, including MiniMax's official WeChat account, is available in the United States through the Apple App Store, the Google Play Store, and the Microsoft Store, and the advertisement in the screenshot below was accessed in this District.



///
///
///
///

175.   MiniMax also advertises Hailuo AI with a video displaying Disney's Spider-Man that Hailuo AI generated to its official TikTok page, which was viewed 20,100 times and received 1,187 "likes."[7]



_____

[7] Video posted by Hailuo AI (MiniMax) (@hailuoai_official), Tɪᴋᴛᴏᴋ (Nov. 5 2024), https://www.tiktok.com/t/ZT6kVrfpt/.

176.    On its Instagram page, MiniMax advertises Hailuo AI with a video that Hailuo AI generated which features Disney's Incredible Hulk.[8]



177.    MiniMax further advertises Hailuo AI with a video on its Instagram page that Hailuo AI generated which features Warner Bros. Discovery's the Joker.[9]



---

[8] Video posted by @neovisionary5 & @hailuoai_official, INSTAGRAM (Feb. 19, 2025), https://www.instagram.com/p/DGPoiyGsllg/.

[9] Video posted by @fata_morgana_ai & @hailuoai_official, INSTAGRAM (May 25, 2025), https://www.instagram.com/p/DKFNcVVoxk5/.

178.    MiniMax again advertises Hailuo AI with a video on its Instagram page that Hailuo AI generated which features Warner Bros. Discovery's characters Rick and Morty.[10]



179.    On its Instagram page, MiniMax advertises Hailuo AI with a video that Hailuo AI generated which features Warner Bros. Discovery's Batman which received more than 2,500 "likes."[11]

///
///
///
///
///
///

---

[10] Video posted by @k.real_petrov & @hailuoai_official, INSTAGRAM (Apr. 8, 2025), https://www.instagram.com/p/DILgRzRMGJm/.

[11] Video posted by @insertitle99 & @hailuoai_official, INSTAGRAM (June 18, 2025), https://www.instagram.com/p/DLD7HlXuHGu/.

1
2
3
4
5
6
7
8
9
10



11    180.    MiniMax advertises Hailuo AI with a video on its Instagram page that Hailuo

12  AI generated which features Warner Bros. Discovery's Superman, which received 1,761

13  "likes."[12]

14
15
16
17
18
19
20
21
22
23
24
25
26
27

28

---

[12] Video posted by @chillgrid & @hailuoai_official, INSTAGRAM (Apr. 1, 2025), https://www.instagram.com/p/DH7UglACYzk/.

181.   On its Instagram page, MiniMax advertises Hailuo AI with a video that Hailuo AI generated which features Disney's Olaf and Elsa.[13]



182.   On its Instagram page, MiniMax advertises Hailuo AI with a video that Hailuo AI generated which features Universal's Minions, which received over 3,300 "likes".[14]



---

[13] Video posted by @maitane140_aiart & @hailuoai_official, INSTAGRAM (Dec. 24, 2024), https://www.instagram.com/reel/DD_q0BPuIsU/?igsh=Mzc3ZTVlOWMwZA%3D%3D.

[14] Video posted by @i3ladimir.neiro & @hailuoai_official, INSTAGRAM (Jan. 18, 2025), https://www.instagram.com/i3ladimir.neiro/reel/DE-LSNBM-qN/.

183.   On its Instagram page, MiniMax advertises Hailuo AI with a video that Hailuo AI generated which features Universal's Shrek and Fiona.[15]



184.   On its Instagram page, MiniMax advertises Hailuo AI with a video that Hailuo AI generated which features Universal's Minions, which received over 18,600 "likes".[16]



---

[15] Video posted by @max.sh_lab & @hailuoai_official, INSTAGRAM (Jan. 18, 2025), https://www.instagram.com/max.sh_lab/reel/DE-Is0LNWEw/.

[16] Video posted by @i3ladimir.neiro & @hailuoai_official, INSTAGRAM (Jan. 30, 2025), https://www.instagram.com/i3ladimir.neiro/reel/DFclDBQMO7h/.

185.   On its Instagram page, MiniMax advertises Hailuo AI with a video that Hailuo AI generated which features Universal's *Despicable Me* characters Gru, Agnes, and a Minion.[17]



///
///
///
///
///
///
///
///
///
///
///

―――――――――――――
[17] Video posted by @aimationlab8 & @hailuoai_official, INSTAGRAM (Mar. 17, 2025), https://www.instagram.com/reel/DHUupojCJRg/.

186.   One Hailuo AI subscriber posted a video on Instagram featuring Disney's Spider-Man, that encourages other users to download MiniMax's Hailuo and request their own videos using Disney's copyrighted characters. [18]





---

[18] Video posted by @neovisionary5, INSTAGRAM (Apr. 20, 2025), https://www.instagram.com/reel/DIsWSC6s0sR/?igsh=Mzc3ZTVlOWMwZA%3D%3D.

187.   Another Hailuo AI subscriber posted an ad on Instagram featuring Disney's Bart and Marge Simpson, that encourages users to download Hailuo AI and generate their own videos using Disney's copyrighted characters.[19]



///
///
///
///
///
///
///
///

_____

[19] Video posted by @aimationlab8, INSTAGRAM (June 10, 2025), https://www.instagram.com/reel/DKvlDRPCw9X/?igsh=Mzc3ZTVlOWMwZA%3D%3D.

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15
16
17
18
19
20
21
22
23
24
25



26
27
28

188. These examples show the popularity of Hailuo AI among consumers who use the service to obtain videos featuring Plaintiffs' copyrighted characters.

189. MiniMax also publicly displays and performs further copies of videos it displayed or distributed to other subscribers on the "Explore" promotional page on its website. There, MiniMax subscribers can view the various videos previously generated by MiniMax for other subscribers. This Explore page features infringing copies of Plaintiffs' Copyrighted Works and showcases how subscribers are drawn to Hailuo AI because of the availability of the Copyrighted Works. Hailuo AI's Explore page publicly displays and performs the following infringing copies of Plaintiffs' works:



///
///
///
///
///
///
///

COMPLAINT



///

///

///

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24



25    ///
26    ///
27    ///
28

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17



18
19
20
21
22
23
24
25   ///
26   ///
27   ///
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23



24
25  ///
26  ///
27  ///
28





190.   By maintaining, publicly displaying and publicly performing infringing copies of Plaintiffs' Copyrighted Works on or via its Explore page, MiniMax is advertising its ability to reliably reproduce Plaintiffs' Copyrighted Works for its subscribers and encourage the infringement of Plaintiffs' copyrights.   MiniMax's Explore gallery also demonstrates that MiniMax subscribers use MiniMax to view and/or download copies of

Plaintiffs' Copyrighted Works, and that the ability to do so is a draw to subscribers who wish to use Hailuo AI for the express purpose of reproducing Plaintiffs' Copyrighted Works.

191.   Moreover, MiniMax's Explore gallery, a prominent feature of its own website, evidences MiniMax's knowledge of the specific infringements of Plaintiffs' Copyrighted Works exhibited in the gallery.

192.   To further advertise and promote its commercial service, MiniMax emblazons its "MiniMax" and "Hailuo AI" logos on videos generated by its Hailuo AI unless a subscriber pays to remove them.   As a result, MiniMax's logos are displayed on content generated by Hailuo AI that exploits Plaintiffs' Copyrighted Works.   This shows that MiniMax is trying to tie itself to Plaintiffs' Copyrighted Works in order to advertise and promote Hailuo AI.

193.   MiniMax's advertisements and promotions of Hailuo AI on social media and its Explore page manifest its express intention and desire to attract MiniMax subscribers (and increase its revenues) by promoting the availability of Plaintiffs' copyrighted characters and MiniMax's ability to reliably reproduce Plaintiffs' Copyrighted Works for its subscribers.   And MiniMax further facilitates infringement by displaying the prompts used to generate the videos on the Explore page which encourages MiniMax subscribers to request similar videos and images to those they find in the gallery.

///
///
///
///
///
///
///
///
///

194.    Several Reddit threads and online posts confirm that Hailuo AI subscribers are drawn to Hailuo AI due to its ability to infringe Plaintiffs' Copyrighted Works. One Reddit user posted a video of a "Batman the Gotham Knight" in the r/HailuoAIOfficial Subreddit.[20]



<hr />

[20] Video posted by  u/jjtiz, REDDIT (r/HailuoAiOfficial), *Batman The Gotham Knight* (2025), https://www.reddit.com/r/HailuoAiOfficial/comments/1isks9b/batman_the_gotham_knight/.

COMPLAINT



195.  Another Hailuo AI subscriber posted a video on TikTok of Warner Bros. Discovery's the Joker, which received more than 1,000 "likes."[21]



196. Another Hailuo AI subscriber posted a video on Instagram of Disney's Elsa.[22]



197. Another Hailuo AI subscriber posted on YouTube, to his 7,200 YouTube subscribers, a video of "SUPERMAN SAVES Little Girl from DEADLY California Fire.[23]



---

[22] Video posted by @aimationlab8, INSTAGRAM (May 21, 2025), https://www.instagram.com/reel/DJ6YE4MicUw/?igsh=Mzc3ZTVlOWMwZA%3D%3D

[23] DREW TUTORIAL, *SUPERMAN SAVES Little Girl from DEADLY California Fire!* (YouTube Jan. 19, 2025), https://www.youtube.com/watch?v=p53wD__mz48.

198.   Another Hailuo AI subscriber posted a video on TikTok of Universal's Minions.[24]



199.   Another Hailuo AI subscriber posted a video on TikTok of Universal's Shrek.[25]



---

[24] Video posted by @natassia_video, TikTok (Jan. 26 2025), https://www.tiktok.com/@nastassia_video/video/7464234332304002309?q=aicreation%20minimax%20minions&t=1750139040687.

[25] Video posted by @DEAD_AI, TikTok (Mar. 14 2025), https://www.tiktok.com/@2025q16/video/7481667063795207454?q=Shrek%20nutella%20minimax&t=1750138222359.

200.   The advertisements, promotions, and social media postings discussed above evidence a substantial consumer interest in using MiniMax's Hailuo AI as a source for unauthorized exploitation of characters and Copyrighted Works owned by Plaintiffs.  They also show that MiniMax subscribers are drawn to the Hailuo AI because the service reproduces and distributes copies of Plaintiffs' Copyrighted Works.

### 5.   MiniMax Chooses to Not Take Any Reasonable Measures to Prevent Further Copyright Infringement.

201.   MiniMax could stop its ongoing copyright infringement.  Specifically, in addition to discontinuing its large-scale infringement of the Copyrighted Works to train its models, MiniMax could readily implement copyright protection measures to prevent or limit infringing outputs.

202.   Other AI services have demonstrated that reasonable, readily available copyright protection measures can prevent or limit infringing generative AI outputs, including by screening image and video outputs for infringing material before the image or video is displayed to the subscriber, and by refusing to allow generations based on prompts likely to elicit infringing content.

203.   The above examples showing MiniMax's ability to reproduce, publicly display, publicly perform, and distribute copies and derivatives of Plaintiffs' Copyrighted Works on demand, confirm that MiniMax does not use any reasonable copyright protection measures to limit infringement of Plaintiffs' Copyrighted Works despite the availability of these measures and their use by MiniMax's competitors.

///

///

///

///

///

///

///

COMPLAINT

204.   Hailuo AI already uses technical measures to prevent the generation of certain content.  For example, if a Hailuo AI subscriber submits a prompt asking for images with violence or nudity, Hailuo AI's protection measures cause a response that says, "Generation failed because content violated Community Guidelines."  An example of this is shown below:



205.   MiniMax's terms and conditions further describe its "Content Standards" which include prohibitions on material that is "sexually explicit or pornographic," and that promotes "violence."  The Content Standards also prohibit material that is "defamatory, obscene, indecent, offensive," or that promotes illegal activity.  The terms and conditions confirm that MiniMax "automatically block[s] some content" on Hailuo AI's website.

206.   Even more, MiniMax has the capability to review and edit user prompts before they are submitted to Hailuo AI.  By default, MiniMax applies its Prompt Optimizer to subscriber prompts which, "refines" or rewrites the subscriber prompt before it is submitted for generation.

207.   This demonstrates that MiniMax controls, and has the ability to control, subscriber prompts and generative outputs through readily available technical protection measures.  Despite having the ability to do so, MiniMax has affirmatively chosen to not use sufficient copyright protection measures to limit the infringement of Plaintiffs' Copyrighted Works.

208.    MiniMax's infringement of Plaintiffs' Copyrighted Works is manifestly willful.  On August 27, 2025, counsel for Plaintiffs sent MiniMax a letter detailing its extensive infringement of Plaintiffs' Copyrighted Works, attached as Exhibit G.   In the letter, Plaintiffs put MiniMax on notice that Hailuo AI was generating videos and images of Plaintiffs' iconic characters including Bart Simpson, Homer Simpson, Iron Man, Deadpool, Spider-Man, Groot, Darth Vader, Yoda, the *Star Wars* droids R2-D2 and C-3PO, Chewbacca, The Mandalorian, Stormtroopers, Clone Troopers, Simba and Nala from *The Lion King*, Elsa and Olaf from *Frozen*, Buzz Lightyear, Mike Wazowski and Sulley from *Monsters Inc.*, WALL-E, Ariel and Flounder from *The Little Mermaid*, Lightning McQueen, Batman, Superman, Wonder Woman, The Joker, Flash, the Teen Titans Go!, Bugs Bunny, Daffy Duck, Tom and Jerry, Sylvester and Tweety, Scooby-Doo, the Powerpuff Girls, Rick and Morty, Minions, Shrek, Donkey, Puss in Boots, Po from *Kung Fu Panda*, Poppy and Branch from *Trolls*, Boss Baby, and Hiccup and Toothless from *How to Train Your Dragon*.

209.    MiniMax did not substantively respond to Plaintiffs' letter as requested and did not cease its infringement.  Despite being put on notice of its infringement of Plaintiffs' Copyrighted Works, MiniMax has not implemented any reasonable technical measures or otherwise attempted to cease its infringement or purge its social media accounts and Explore page of the numerous videos and images infringing Plaintiffs' Copyrighted Works. Notably, the infringing images and videos shown above include images that were reproduced, publicly displayed, publicly performed, and/or distributed by MiniMax *after* Plaintiffs sent their cease-and-desist letter to MiniMax.

210.    MiniMax's unlawful conduct has caused, and will continue to cause, substantial and irreparable harm to Plaintiffs if it is not enjoined.

211.    Plaintiffs exercise their exclusive rights to exploit and license (or not to license) their characters and intellectual property to develop and grow selected markets for their Copyrighted Works, which includes selling products that contain images of their Copyrighted Works and promoting and exploiting video clips of their Copyrighted

Works.  MiniMax's conduct usurps Plaintiffs' control over the exercise of their exclusive rights in their Copyrighted Works interfering with Plaintiffs' exploitation and licensing strategies.

212.   MiniMax illegally and unfairly competes with companies that license Plaintiffs' Copyrighted Works for the purpose of creating authorized derivatives and undercuts those existing and potential licensing markets.  Such companies negotiate licenses with Plaintiffs and abide by contractual restrictions in those agreements.  MiniMax need not honor such contractual restrictions because it circumvents the licensing process altogether.

213.   Since its release, MiniMax has increased the maximum length of Hailuo AI's video outputs from six to ten seconds.  Given the rapid advancement in technology in the AI video generation field, combined with MiniMax's advertising that Hailuo AI is like "a Hollywood Studio in your pocket," it is only a matter of time until Hailuo AI can generate unauthorized, infringing videos featuring Plaintiffs' copyrighted characters that are substantially longer, and even eventually the same duration as a movie or television program.

214.   MiniMax is also contributing to consumer confusion regarding what is lawful and what is not lawful by misleading its subscribers to believe that MiniMax's massive copying and the countless infringing videos and images generated by Hailuo AI are somehow authorized by Plaintiffs.  MiniMax compounds that consumer confusion by emblazoning its "MiniMax" and "Hailuo AI" logos on videos and images generated by Hailuo AI that feature Plaintiffs' Copyrighted Works.

215.   Plaintiffs have no adequate remedy at law for the substantial and irreparable harm that MiniMax has caused and continues to cause.  MiniMax must be held accountable for its vast, intentional, and unrelenting copyright infringement and enjoined from further infringing activities.

1

2

### FIRST CLAIM FOR RELIEF

### (Direct Copyright Infringement)

3   216.   Plaintiffs incorporate herein by reference each and every averment contained

4   in paragraphs 1 to 215 inclusive.

5   217.   Plaintiffs own the Copyrighted Works at issue, including those in the non-

6   exhaustive, representative lists attached as Exhibits A, B, and C, and have the exclusive

7   right, among others, to reproduce, publicly display, publicly perform, distribute, and make

8   derivative works under Section 106 of the Copyright Act.

9   218.   Plaintiffs never authorized MiniMax to reproduce, publicly display, publicly

10  perform, distribute, make derivatives of, or otherwise exploit their Copyrighted Works.

11  219.   MiniMax has directly infringed Plaintiffs' Copyrighted Works by unlawfully

12  reproducing, publicly displaying, publicly performing, distributing, and making derivative

13  works based on Plaintiffs' Copyrighted Works both in developing and training the Hailuo

14  AI service and in the outputs MiniMax generates for its subscribers.

15  220.   Each act of infringement by MiniMax constitutes a separate and distinct act

16  of infringement.

17  221.   MiniMax's acts of infringement are willful, in disregard of and with

18  indifference to Plaintiffs' rights.

19  222.   MiniMax is purposefully exploiting Plaintiffs' valuable intellectual property

20  to attract subscribers and profiting by providing subscribers with countless copies and

21  derivatives of Plaintiffs' Copyrighted Works.

22  223.   As a direct and proximate result of MiniMax's infringement, Plaintiffs are

23  entitled to damages and MiniMax's profits in an amount according to proof.

24  224.   Alternatively, and at its election, Plaintiffs are entitled to statutory damages,

25  up to $150,000 per infringed work by virtue of MiniMax's willful infringement, or for such

26  other amounts as may be proper under 17 U.S.C. § 504.

27  225.   Plaintiffs are further entitled to recover its attorneys' fees and full costs

28  pursuant to 17 U.S.C. § 505.

226.   As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, MiniMax will continue to infringe Plaintiffs' rights in their Copyrighted Works.  Plaintiffs are entitled to injunctive relief under 17 U.S.C. § 502.

## SECOND CLAIM FOR RELIEF

### (Secondary Copyright Infringement)

227.   Plaintiffs incorporate herein by reference each and every averment contained in paragraphs 1 to 226 inclusive.

228.   Plaintiffs allege that MiniMax is the direct copyright infringer of the Copyrighted Works at issue in this litigation.  However, in the event that MiniMax argues that it is not the direct infringer of Plaintiffs' Copyrighted Works, and that its own subscribers are somehow the direct infringers of the Copyrighted Works, then Plaintiffs plead, in the alternative, that MiniMax is nevertheless liable for secondary copyright infringement.

229.   Plaintiffs own the Copyrighted Works at issue, including those in the non-exhaustive, representative list attached as Exhibits A, B, and C, and have the exclusive right, among others, to reproduce, publicly display, publicly perform, distribute, and make derivative works under Section 106 of the Copyright Act.

230.   As alleged above, the unauthorized reproduction, public display, public performance, distribution, and creation of derivatives of Plaintiffs' Copyrighted Works through MiniMax's output infringes Plaintiffs' exclusive copyrights under Section 106 of the Copyright Act.

231.   If MiniMax contends that its own subscribers are the volitional actors responsible for making the copies of Plaintiffs' Copyrighted Works identified in this Complaint, such copying was done (and is being done) without Plaintiffs' authorization or consent and constitutes copyright infringement under the Copyright Act.

232.   MiniMax is vicariously liable for these acts of direct copyright infringement (assuming they are adjudicated to be direct infringement by MiniMax's subscribers).

233.   MiniMax has the right and ability to supervise and/or control these acts of direct copyright infringement.

234.   *First*, MiniMax has the ability to control the copyright infringement at issue because MiniMax controls and selects which of Plaintiffs' Copyrighted Works are copied and used to train Hailuo AI, embodied as copies into the Hailuo AI service, and made available for public display, public performance, and/or download.  MiniMax had the right and ability to exclude Plaintiffs' Copyrighted Works from its training data.

235.   *Second*, MiniMax has the right and ability to control the prompts from its subscribers that are submitted to Hailuo AI to generate an output and the ability to block subscribers who request infringing content.

236.   *Third*, MiniMax has protection measures already in place that expressly block subscriber prompts that request violence, sexually explicit or pornographic material, or defamatory or obscene material, or material for use in political campaigns.   MiniMax, however, has not implemented those measures to limit Hailuo AI from infringing Plaintiffs' Copyrighted Works.  This is the case even though such copyright protection measures are employed by some of MiniMax's competitors.

237.   As evidenced by the Explore pages featuring Plaintiffs' Copyrighted Works, and the public interest in using the Hailuo AI to produce infringing copies of Plaintiffs' Copyrighted Works, the ability to use the Hailuo AI to obtain copies of Plaintiffs' Copyrighted Works is plainly an attraction and a draw for subscribers.  Indeed, MiniMax itself advertises Hailuo AI's ability to infringe Plaintiffs' Copyrighted Works on its own social media pages.

238.   At all relevant times, MiniMax has derived a direct financial benefit from each act of direct infringement at issue.  MiniMax is a commercial service as MiniMax offers subscribers five levels of paid subscriptions and incentivizes paid tiers by preventing free subscribers' from generating videos and images in Hailuo AI unless they upgrade to a paid

subscription. Thus, MiniMax receives revenue from its subscribers' infringement of Plaintiffs' Copyrighted Works. By providing image and video generations and more features to subscribers with more expensive plans, MiniMax encourages its subscribers to pay for its service. Moreover, MiniMax has been valued at about $4 billion in the company's relatively short existence. MiniMax's economic success is directly tied to the popularity of Hailuo AI and its ability to reproduce, publicly display, publicly perform, and create derivatives of Plaintiffs' Copyrighted Works.

239. MiniMax is also secondarily liable for copyright infringement as a contributory infringer (if MiniMax contends that its subscribers are the ones making the infringing copies of Plaintiffs' Copyrighted Works identified in this Complaint) because MiniMax knowingly and materially contributes to, encourages and induces such infringement.

240. MiniMax has actual knowledge of, or is willfully blind to, the direct infringement of Plaintiffs' Copyrighted Works done through Hailuo AI. At a minimum, through its cease-and-desist letter, Plaintiffs put MiniMax on notice that Hailuo AI was being used to infringe Plaintiffs' Copyrighted Works and the specific characters identified in the letter (see Exhibit G). Additionally, MiniMax has actual knowledge of the direct infringement of Plaintiffs' Copyrighted Works through its ongoing relationship with its subscribers as MiniMax publicly displays and performs the infringing copies, reproductions, and derivatives generated by Hailuo AI for its subscribers on the MiniMax Explore page. Indeed, as shown above, MiniMax's own advertisements and promotions on its website and social media pages display and perform videos generated by Hailuo AI at the request of its subscribers which infringe Plaintiffs' Copyrighted Works.

241. MiniMax specifically designed Hailuo AI – and continues to promote and advertise the service – to encourage, contribute to and induce the reproduction, public display, public performance, distribution, and preparation of derivative works of copyrighted works. As alleged above, MiniMax intentionally trained Hailuo AI to readily produce, publicly display, distribute, and publicly perform reproductions and derivatives

of Plaintiffs' Copyrighted Works.  MiniMax would not be able to create such infringing output without its intentional design enabling that infringement.

242.   Additionally, MiniMax has the means to take simple steps not to materially contribute to the specific infringing activity but fails to do so.  MiniMax has failed to take reasonable, readily available, and cost-effective steps to purge Hailuo AI of Plaintiffs' Copyrighted Works identified in Plaintiffs' cease-and-desist letter and its own website promotional pages.  Even more, MiniMax has the right and ability to limit Hailuo AI's ability to copy, reproduce, and prepare derivatives of Plaintiffs' Copyrighted Works.  MiniMax has failed to implement simple measures, such as copyright protection measures, that would limit Hailuo AI's ability to copy, reproduce, and prepare derivatives of Plaintiffs' Copyrighted Works despite the availability of such copyright protection measures and their use by other AI content generating services.

243.   Instead of taking simple, available steps to not materially contribute, encourage, or induce to the specific infringing activity, MiniMax actively facilitates the ongoing infringement through its actions above.  As a direct and proximate result, MiniMax has secondarily infringed Plaintiffs' Copyrighted Works.

244.   Each act of secondary infringement by MiniMax constitutes a separate and distinct act of infringement.

245.   MiniMax's acts of secondary infringement are willful, in disregard of and with indifference to Plaintiffs' rights.

246.   MiniMax is purposefully exploiting Plaintiffs' valuable intellectual property to attract subscribers to MiniMax and it is profiting by providing subscribers with endless copies and derivatives of Plaintiffs' Copyrighted Works.

247.   MiniMax has failed to take reasonable steps to prevent the copyright infringement of its subscribers.  As a direct and proximate result of MiniMax's infringement, Plaintiffs are entitled to damages and MiniMax's profits in an amount according to proof.

248.   Alternatively, and at its election, Plaintiffs are entitled to statutory damages, up to $150,000 per infringed work by virtue of MiniMax's willful infringement, or for such other amounts as may be proper under 17 U.S.C. § 504.

249.   Plaintiffs are further entitled to recover its attorneys' fees and full costs pursuant to 17 U.S.C. § 505.

250.   As a direct and proximate result of the foregoing acts and conduct, Plaintiffs have sustained and will continue to sustain substantial and irreparable injury, for which there is no adequate remedy at law.  Unless enjoined and restrained by this Court, MiniMax will continue to infringe Plaintiffs' rights in their Copyrighted Works.   Plaintiffs are entitled to injunctive relief under 17 U.S.C. § 502.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.   For Plaintiffs' damages and MiniMax's profits in such amount as may be found; alternatively, at Plaintiffs' election, for maximum statutory damages; or for such other amounts as may be proper pursuant to 17 U.S.C. § 504(c);

2.   For an accounting, the imposition of a constructive trust, restitution of MiniMax's unlawful proceeds from copyright infringement, and damages according to proof;

3.   For preliminary and/or permanent injunctive relief enjoining and restraining MiniMax and all of its officers, agents, servants, and employees and all persons acting in concert or participation with MiniMax, from: (a) infringing Plaintiffs' exclusive rights under the Copyright Act by copying, publicly displaying, publicly performing, and/or distributing Plaintiffs' Copyrighted Works, (b) offering Hailuo AI without appropriate copyright protection

measures to prevent such infringement, and (c) otherwise engaging in the copyright infringement conduct described above;

4.    For prejudgment interest according to law;

5.    For attorneys' fees and costs pursuant to 17 U.S.C. § 505; and

6.    Any further and additional relief the Court may deem just and proper.

Dated: September 16, 2025          JENNER & BLOCK LLP

By:    _____/s/ David R. Singer_____
                    David R. Singer
                    Julie A. Shepard
                    Lauren M. Greene

                Attorneys for Plaintiffs
                DISNEY ENTERPRISES, INC.,
                UNIVERSAL CITY STUDIOS
                PRODUCTIONS LLLP, WARNER BROS.
                ENTERTAINMENT INC., MARVEL
                CHARACTERS, INC., MVL FILM
                FINANCE LLC, LUCASFILM LTD. LLC,
                TWENTIETH CENTURY FOX FILM
                CORPORATION, DC COMICS, THE
                CARTOON NETWORK, INC., TURNER
                ENTERTAINMENT CO., HANNA-
                BARBERA PRODUCTIONS, INC., and
                DREAMWORKS ANIMATION L.L.C.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a jury trial.

Dated: September 16, 2025          JENNER & BLOCK LLP


By: _____ */s/ David R. Singer* _____
                        David R. Singer
                        Julie A. Shepard
                        Lauren M. Greene

                        Attorneys for Plaintiffs
                        DISNEY ENTERPRISES, INC.,
                        UNIVERSAL CITY STUDIOS
                        PRODUCTIONS LLLP, WARNER BROS.
                        ENTERTAINMENT INC., MARVEL
                        CHARACTERS, INC., MVL FILM
                        FINANCE LLC, LUCASFILM LTD. LLC,
                        TWENTIETH CENTURY FOX FILM
                        CORPORATION, DC COMICS, THE
                        CARTOON NETWORK, INC., TURNER
                        ENTERTAINMENT CO., HANNA-
                        BARBERA PRODUCTIONS, INC., and
                        DREAMWORKS ANIMATION L.L.C.