QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Robert M. Schwartz (Bar No. 117166)
    robertschwartz@quinnemanuel.com
  Daniel C. Posner (Bar No. 232009)
    danposner@quinnemanuel.com
  Aaron Perahia (Bar No. 304554)
    aaronperahia@quinnemanuel.com
  Moon Hee Lee (Bar No. 318020)
    moonheelee@quinnemanuel.com
  Bradley Kahn (Bar No. 364637)
    bradleykahn@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017-2543
Telephone:   (213) 443-3000
Facsimile:   (213) 443-3100

Attorneys for Defendant
Nanonoble Pte. Ltd.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DISNEY ENTERPRISES, INC., a Delaware corporation; UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP, a Delaware limited liability limited partnership; WARNER BROS. ENTERTAINMENT INC., a Delaware corporation; MARVEL CHARACTERS, INC., a Delaware corporation; MVL FILM FINANCE LLC, a Delaware limited liability company; LUCASFILM LTD. LLC, a California limited liability company; TWENTIETH CENTURY FOX FILM CORPORATION, a Delaware corporation; DC COMICS, a New York general partnership; THE CARTOON NETWORK, INC., a Delaware corporation; TURNER ENTERTAINMENT CO., a Delaware corporation; HANNA-BARBERA PRODUCTIONS, INC., a Delaware corporation; and DREAMWORKS | Case No. 2:25-cv-08768-SB-E **DEFENDANT NANONOBLE PTE. LTD.'S NOTICE OF MOTION AND MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6); MEMORANDUM OF POINTS AND AUTHORITIES** Date:      May 29, 2026 Time:      8:30 a.m. Place:     Courtroom 6C Judge:    Hon. Stanley Blumenfeld, Jr. Trial Date:    Not Set |

ANIMATION L.L.C., a Delaware limited liability company,

           Plaintiffs,

    vs.

MINIMAX, a Chinese company; SHANGHAI XIYU JIZHI TECHNOLOGY CO. LTD., a Chinese limited company; NANONOBLE PTE. LTD., a Singaporean private limited company and DOES 1 through 20, inclusive,

           Defendants.

MOTION TO DISMISS DEFENDANT NANONOBLE PTE. LTD. PURSUANT TO FED. R. CIV. P. 12(b)(6)

# <u>NOTICE OF MOTION</u>

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD**:

PLEASE TAKE NOTICE that, on Friday, May 29, 2026, at 8:30 a.m., or as soon thereafter as the matter may be heard by the Honorable Stanley Blumenfeld Jr., in Courtroom 6C, United States District Court for the Central District of California, First Street Courthouse, 350 W. First Street, Los Angeles, California, 90012, Defendant Nanonoble Pte. Ltd. ("**Nanonoble**") will, and hereby does, move the Court for an order dismissing the Complaint with prejudice.

Defendants MiniMax and Shanghai Xiyu Jizhi Technology Co. Ltd. ("**SXJT,**" and collectively with MiniMax and Nanonoble, "**Defendants**") have concurrently moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2). If the Court declines to dismiss Defendants MiniMax or SXJT under Rule 12(b)(2), the arguments in this motion apply equally to all three Defendants and the Court should dismiss them all on that basis.

Nanonoble makes this Motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure on the grounds that:

1.  Plaintiffs Disney Enterprises, Inc., Universal City Studios Productions LLLP, Warner Bros. Entertainment Inc., Marvel Characters, Inc., MVL Film Finance LLC, Lucasfilm Ltd. LLC, Twentieth Century Fox Film Corporation, DC Comics, The Cartoon Network, Inc., Turner Entertainment Co., Hanna-Barbera Productions, Inc., and DreamWorks Animation L.L.C. (collectively, the "**Studios**"), fail to state a claim for direct or secondary copyright infringement because they do not plausibly allege ownership of valid, registered copyrights in the "character" works at issue, independent of the underlying audiovisual works in which those characters appear.

2.  The Studios fail to state a claim for direct copyright infringement because:

      a.      The Studios' training allegations fail to identify any act of copying or training that occurred within the United States;

      b.      The Studios' output allegations rest on videos that the Studios' own lawyers created, which cannot constitute infringement of the Studios' own copyrights; and

      c.      The Studios' output allegations fail to allege volitional conduct by Nanonoble because users—not Nanonoble—select and create the video outputs.

3.      The Studios fail to state a claim for secondary copyright infringement—whether based on contributory or vicarious liability—because the Studios do not plausibly allege that any third party committed any act of direct infringement.

4.      The Studios fail to state a claim for secondary copyright infringement based on vicarious liability because:

      a.      The Studios fail to plausibly allege Nanonoble has the right and ability to control the alleged infringements; and

      b.      The Studios fail to plausibly allege direct financial benefit.

5.      The Studios fail to state a claim for secondary copyright infringement based on contributory liability because:

      a.      Nanonoble's technology is capable of substantial noninfringing uses; and

      b.      the Studios fail to plausibly allege inducement.

Nanonoble bases this Motion on this Notice of Motion and Motion, the Memorandum of Points and Authorities, the April 10, 2026 Declaration of Daniel C. Posner ("**Posner Decl.**"), the documents on file in this action, and any other evidence or argument presented to the Court, as well as matters of which the Court may take judicial notice.

**<u>Compliance with Local Rule 7-3 (Pre-Filing Conference of Counsel)</u>**

Nanonoble brings this Motion after the March 26, 2026 meet-and-confer conference conducted under Central District Local Rule 7-3.  Counsel for the parties met and conferred by Zoom videoconference.  Attorneys David Singer, Lauren M. Greene, and Andrew J. Thomas attended on behalf of the Studios, and Daniel C. Posner, Aaron Perahia, and Bradley Kahn attended on behalf of Nanonoble.  During the conference, counsel for the parties discussed the substance of the Motion and the possibility of resolution, including the issues and arguments in the Notice and Memorandum of Points and Authorities.  The Studios declined to voluntarily dismiss this action or amend the Complaint.  *See* Posner Decl., ¶ 3.

Dated:  April 10, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
  Robert M. Schwartz
  Daniel C. Posner
  Aaron Perahia
  Moon Hee Lee
  Bradley Kahn

By: _____
      Robert M. Schwartz
*Attorneys for Defendant Nanonoble*

Motion to Dismiss Defendant Nanonoble Pte. Ltd. Pursuant to Fed. R. Civ. P. 12(b)(6)

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................ 1

ALLEGATIONS OF THE COMPLAINT .................................................................. 4

    A.    Defendant Nanonoble And The Hailuo AI Tool. .................................. 4

    B.    The Studios' Infringement Allegations.................................................. 5

ARGUMENT ............................................................................................................... 7

I.    THE STUDIOS FAIL TO SUFFICIENTLY ALLEGE COPYRIGHTABLE, REGISTERED CHARACTERS ................................... 7

    A.    The Studios Fail To Identify Copyright Registrations That Cover Their Characters. ................................................................................... 7

    B.    The Studios Fail To Plausibly Allege Copyrightable Characters. ........... 8

        1.    The Studios Fail The "Especially Distinctive" Test..................... 9

        2.    The Studios Fail The "Story Being Told" Test. ......................... 10

II.    THE STUDIOS FAIL TO STATE A CLAIM FOR DIRECT INFRINGEMENT .......................................................................................... 10

    A.    The Studios' Training Allegations Fail.................................................. 10

    B.    The Studios' Output Allegations Fail. .................................................. 11

        1.    The Studios Rely On Non-Actionable Video Outputs That The Studios Created With The Hailuo AI Tool.......................... 11

        2.    The Output Allegations Lack Volitional Conduct...................... 13

III.    THE STUDIOS FAIL TO STATE A CLAIM FOR SECONDARY INFRINGEMENT .......................................................................................... 14

    A.    The Studios Fail To Plausibly Allege Third-Party Infringement. ........ 14

    B.    The Studios Fail To State A Claim Based On Vicarious Liability....... 15

        1.    The Complaint Fails To Plausibly Allege That Nanonoble Has The Right And Ability To Control Infringement. ............... 16

        2.    The Studios Fail To Allege Direct Financial Benefit................. 17

    C.    The Studios Fail To State A Claim For Contributory Liability............ 18

        1.    Hailuo AI Is Capable Of Substantial Noninfringing Uses. ........ 18

        2.    The Studios Fail To Plausibly Allege Inducement..................... 19

CONCLUSION..................................................................................................21

CERTIFICATE OF L.R. 11-6.1 COMPLIANCE RE: WORD COUNT.................23

# TABLE OF AUTHORITIES

**Page**

**Cases**

*A&M Records, Inc. v. Napster, Inc.*,
  239 F.3d 1004 (9th Cir. 2001)..................................................................................15

*Allarcom Pay Television. Ltd. v. General Instrument Corp.*,
  69 F.3d 381 (9th Cir. 1995)....................................................................................11

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ..........................................................................................8, 20

*Carroll Shelby Licensing, Inc. v. Halicki*,
  138 F.4th 1178 (9th Cir. 2025)..................................................................................9

*Cobbler Nevada, LLC v. Gonzales*,
  901 F.3d 1142 (9th Cir. 2018)................................................................................16

*Cox Communications, Inc. v. Sony Music Entertainment*,
  146 S. Ct. 959 (2026).......................................................................3, 18, 19, 21

*Daniels v. Walt Disney Co.*,
  958 F.3d 767 (9th Cir. 2020)..............................................................................9, 10

*DraftExpress, Inc. v. Whistle Sports, Inc.*,
  2022 WL 16962285 (C.D. Cal. Aug. 2, 2022) ......................................................12

*Ellison v. Robertson*,
  357 F.3d 1072 (9th Cir. 2004) ...............................................................................17

*Feist Publications, Inc. v. Rural Telephone Service Co., Inc.*,
  499 U.S. 340 (1991) .................................................................................................8

*Garcia v. Best West Norwalk Inn, LLC*,
  2021 WL 4260406 (C.D. Cal. June 14, 2021).........................................................2

*Hunley v. Instagram, LLC*,
  73 F.4th 1060 (9th Cir. 2023)................................................................................14

*Knievel v. ESPN*,
  393 F.3d 1068 (9th Cir. 2005).............................................................................2, 12

iii

Case No. 2:25-cv-08768-SB-E

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
    545 U.S. 913 (2005) ....................................................................15, 18, 19, 20, 21

*Perfect 10, Inc. v. Amazon.com, Inc.*,
    508 F.3d 1146 (9th Cir. 2007) ......................................................14, 16, 17, 20

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) .........................................................................17

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) .............................................................17, 20, 21

*Perfect 10, Inc. v. Yandex N.V.*,
    962 F. Supp. 2d 1146 (N.D. Cal. 2013)...........................................................11

*Rice v. Fox Broadcasting Co.*,
    330 F.3d 1170 (9th Cir. 2003) .............................................................................8

*Richmond v. Weiner*,
    353 F.2d 41 (9th Cir. 1965) ..............................................................................12

*Siegel v. Warner Bros. Entertainment Inc.*,
    690 F. Supp. 2d 1048 (C.D. Cal. 2009)...............................................................8

*Sony Corporation of America v. Universal City Studios, Inc.*,
    464 U.S. 417 (1984) ..............................................................................14, 19, 20

*Subafilms, Ltd. v. MGM-Pathe Communications Co.*,
    24 F.3d 1088 (9th Cir. 1994) (en banc)......................................................11, 14

*VHT, Inc. v. Zillow Group, Inc.*,
    918 F.3d 723 (9th Cir. 2019) .......................................................13, 14, 15, 20

*Warner Bros. Pictures, Inc. v. Columbia Broadcasting System, Inc.*,
    216 F.2d 945 (9th Cir. 1954) ............................................................................10

**<u>Statutes</u>**

17 U.S.C. § 103(b)................................................................................................7

17 U.S.C. § 411(a)................................................................................................7

**<u>Rules/Other Authorities</u>**

Fed. R. Civ. P. 11................................................................................................12

         Case No. 2:25-cv-08768-SB-E

Fed. R. Civ. P. 12(b)(2) ...........................................................................................4

Fed. R. Civ. P. 12(b)(6) ...........................................................................................2

*Compendium of U.S. Copyright Office Practices* § 313.4(h) (3d ed. 2021) ...............................................................................................................7

Case No. 2:25-cv-08768-SB-E

**INTRODUCTION**

It is ironic—and disturbing—that in a case about artificial intelligence, the Studios have presented an entirely artificial dispute. To get there, the Studios have ignored the Copyright Act's requirements and failed to state a claim. The Court should dismiss their Complaint.

The Studios lead with the melodramatic—and false—assertion that the Hailuo AI tool "pirates and plunders" the Studios' works "on a massive scale." Compl. (Dkt. 1), ¶ 1. But the Complaint is devoid of any allegations that Hailuo AI subscribers are using the tool to infringe the Studios' works. To claim otherwise, the Studios identify 52 instances in which someone used Hailuo AI to create a video depicting the Studios' allegedly copyrighted characters. *Id.* ¶¶ 117-60. But no Hailuo AI subscriber created *a single one* of those videos. Instead, *the Studios' lawyers created all of them* to give the impression of rampant infringement.

Contrary to the Studios' insinuations, Nanonoble has not concealed its operation of Hailuo AI from the public. Nanonoble's parent, MiniMax Group, Inc., is a publicly traded company, listed on the Hong Kong Stock Exchange. A quick internet search would have given the Studios this information—and spared the Court from having to hold hearings on the Studios' claimed inability to locate MiniMax—in a fraction of the time they spent manipulating the Hailuo AI tool to generate fake instances of infringement.

Through years of effort and investment, Nanonoble, alongside its sister entities within the MiniMax Group, has developed some of the most advanced AI products in the market that more than 200 million users worldwide use today. These include MiniMax, Hailuo AI, Talkie/Xingye, and a platform that provides enterprise customers and developers with API access to these products' underlying AI models. These also include large-language models as well as models for video and audio generation.

MOTION TO DISMISS DEFENDANT NANONOBLE PTE. LTD. PURSUANT TO FED. R. CIV. P. 12(b)(6)

Here, the Studios have targeted the Hailuo AI tool.  It enables users to create 6- to 10-second videos based on a text or image input.  As with conventional video editing software, Hailuo AI is copyright neutral and capable of vast noninfringing uses.  Some are reflected in the user-generated content on Hailuo AI's homepage, none of which depicts any of the Studios' content:

*See* Homepage (screenshot), *in* HAILUOAI.VIDEO https://hailuoai.video/.[1]

Nothing supports the allegation that "[Nanonoble] built its business from intellectual property stolen from Hollywood studios like Plaintiffs."  Compl. ¶ 1.  Nor can the Studios' claims survive Rule 12(b)(6):

*First*, the Studios fail to plausibly allege valid, registered copyrights in the "character" works at issue.  The Studios do not allege that any Hailuo AI video

---

[1]   The Complaint incorporates Hailuo AI's website by reference; thus, the Court may take judicial notice of it.  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005).  The Complaint "necessarily relies" on Hailuo AI's website content, as screenshots of the website and its content underpin many of the Studios' allegations.  Compl. ¶¶ 34, 36(c)-(f), 111, 115, 167, 189, 191, 205, 240, 242; *Garcia v. Best W. Norwalk Inn, LLC*, 2021 WL 4260406, at *2 (C.D. Cal. June 14, 2021) (holding website incorporated by reference after plaintiff cited to in complaint).

output reproduces their films or television programs, or that any Hailuo AI output copies any plot, dialogue, settings, pace, or mood of those works.  Instead, the Studios base their claims on the assumption that the characters that appear in their works are necessarily copyrightable just because the movies or TV programs are. But the Copyright Act does not automatically protect characters simply because they appear in a registered work.  The Studios do not identify registrations that specifically cover any characters.  And they fail to plead facts satisfying either of the Ninth Circuit's rigorous tests to assess the copyrightability of characters.

*Second*, the Studios' claim for direct infringement fails because Nanonoble's alleged conduct is: (a) extraterritorial, (b) authorized, and (c) non-volitional.  The allegations about model "training"—*i.e.*, the aggregation of data used to enable users to create videos—fail under the extraterritoriality doctrine: foreign entities developed and trained Hailuo AI outside the U.S., and the Studios identify no act of copying that occurred within the U.S.  As to the output allegations, the Studios rely primarily on 52 video outputs the Studios' lawyers created using the Hailuo AI tool. But a copyright owner cannot infringe its own copyright.  And none of the "copying" that occurred in the subscribers' generation of video outputs involved the kind of direct ("volitional") conduct **by Nanonoble** required to plead direct liability.

*Third*, the Studios fail to plausibly allege secondary infringement under theories of vicarious or contributory liability.  Because the Studios created the primary outputs at issue, no direct infringement supports either form of secondary liability.  Even if there were, the vicarious liability theory fails because there is no plausible allegation that Nanonoble is capable of policing the millions of videos produced by third parties using Hailuo AI and, thus, lacks the requisite control.  And Nanonoble derives no direct financial benefit from infringement, as subscribers pay a flat fee regardless of whether they generate noninfringing or infringing works. The contributory infringement theory fails under *Cox Commc'ns, Inc. v. Sony Music Ent.*, 146 S. Ct. 959 (2026), which holds that a service provider is only liable if its

service was tailored to infringement or if it affirmatively induced infringement. Hailuo AI is indisputably capable of substantial noninfringing uses, including as demonstrated in the Complaint, defeating the tailoring theory. And the Studios fail to plausibly allege that Nanonoble actively encouraged any user to infringe their works, defeating the inducement theory.

Nanonoble files this motion concurrently with Defendants MiniMax and SXJT's Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction. If the Court declines to grant Defendants MiniMax and SXJT's Rule 12(b)(2) motion, the arguments in this motion apply to all three Defendants with equal force and the Court should dismiss the Complaint as to all Defendants.

## ALLEGATIONS OF THE COMPLAINT

### A.    Defendant Nanonoble And The Hailuo AI Tool.

Nanonoble, a Singaporean private limited company, is the sole operator of the version of Hailuo AI available to users in the United States. Compl. ¶ 34. Nanonoble is part of MiniMax Group, "a global AI foundation model company" serving "over 157 million individual users across over 200 countries and regions," with "its headquarters in Shanghai, China." Compl. ¶ 32; Ex. D at 2. The Studios do not allege that Nanonoble maintains offices, employees, servers, or operations in the U.S. *See id*. ¶¶ 32-34.

Hailuo AI is a generative "artificial intelligence ('AI') image and video generating service." Compl. ¶¶ 1, 110. The tool creates a silent 6- to 10-second video output in response to a user's prompt. *Id*. ¶¶ 6, 113, 165. Hailuo AI produces an output only "[i]f a [Hailuo AI] subscriber submits a simple text prompt requesting" specific content—users "just type what [they] want." *Id*. ¶¶ 6, 171. Nanonoble offers free and paid subscription tiers. *Id*. ¶¶ 111-13. Paid subscribers pay the same amount regardless of what the output depicts. *Id*. ¶¶ 112-14.

On its face, the Complaint shows that Hailuo AI is capable of significant noninfringing uses. Screenshots in the Complaint depict prompts generating "an

4                                  Case No. 2:25-cv-08768-SB-E

animated scene featuring an owl working as a hospital administrator," "a cinematic time-lapse video capturing a panoramic view of a modern city," a "woman [who] looks to camera and offers flowers," and a scene in "a dining room of an old abandoned mansion." *See* Compl. ¶ 189.

 

### B.    The Studios' Infringement Allegations.

The Studios are movie and TV studios and their subsidiaries. Compl. ¶¶ 15-30. They allege ownership of copyrights to audiovisual works, including motion pictures and television series such as *Star Wars*, *The Lion King*, *Batman*, *Superman*, *Despicable Me*, and *Shrek*. *Id*. ¶¶ 21, 27, 30 & Exs. A, B, C. Despite the Studios' alleged copyright registrations in those works, they limit their infringement claims to the characters that appear in them. *See id*.

The Studios assert direct, contributory, and vicarious infringement claims. Compl. ¶¶ 216-50. In their direct infringement claim, they accuse Nanonoble of: (1) copying the Studios' works to train the Hailuo AI model (the "**Training Allegations**"), and (2) generating outputs that depict the Studios' characters (the "**Output Allegations**"). *See id.* ¶ 219. The Studios premise their secondary-infringement claim solely on the Output Allegations and assume that Hailuo AI users are direct infringers. *See id.* ¶¶ 227, 232, 239.

The Training Allegations concern the "education" of the Hailuo AI model. *See* Compl. ¶¶ 161-64, 219. The Studios allege that Hailuo AI's developers: (1) "downloaded from the internet, and other sources, content using tools variously described as bots, scrapers, streamrippers, video downloaders, and web crawlers" (2) "cleaned" the copies "through a filtering process" and "reformatted" them to prepare the data for training; and (3) used that data to "train" the model, a process the Studios claim "involved the fixation of copies … in a tangible medium." *Id.* ¶ 162(a)-(c). The Studios allege that the Hailuo AI tool relies on "software, servers, and other technology to store and fix data," such that the Studios' works are "embodied in the model." *Id.* ¶ 163. The Training Allegations do not identify a U.S. location for this conduct. *See id.* ¶¶ 161-64, 219.

The Output Allegations concern the videos that Hailuo AI generates. *See* Compl. ¶¶ 6, 118-60, 165-68, 170, 174-93. The Studios focus on 52 instances where Hailuo AI users created videos allegedly depicting characters that appear in the Studios' movies and TV programs. *Id*. ¶¶ 118-59. These claims depend on the Studios' assumption that copyright law protects the depicted "characters." Yet the Studios rely on conclusory labels—calling characters "iconic" or "central"—without identifying the expressive traits that purportedly render them protectable. *See, e.g., id.* ¶ 51 (alleging that Deadpool, Groot, Wolverine, and Captain America are "iconic central characters" without further elaboration). Some of the alleged infringements also rest on depictions of uncopyrightable human appearance or actor likeness. *See, e.g., id.* ¶¶ 9 (a live-action depiction of the Joker), 169 (a live-action depiction of the Joker, Wolverine, and Flash). The Studios do not allege that any of Nanonoble's employees or third-party users submitted these "prompts." *See id.* ¶¶ 118-59. The Studios also cite an "Explore" page on the Hailuo AI website "displaying videos generated by subscribers," as well as social media posts that the Studios allege are "paid partnerships" or re-posts of user content. *Id.* ¶¶ 170, 174-89.

Case No. 2:25-cv-08768-SB-E

MOTION TO DISMISS DEFENDANT NANONOBLE PTE. LTD. PURSUANT TO FED. R. CIV. P. 12(b)(6)

**ARGUMENT**

**I.    THE STUDIOS FAIL TO SUFFICIENTLY ALLEGE COPYRIGHTABLE, REGISTERED CHARACTERS**

  **A.    The Studios Fail To Identify Copyright Registrations That Cover Their Characters.**

The Studios do not allege that the content of any Hailuo AI video is substantially similar to the content of any movie or TV program that the Studios have registered for copyright.  Instead, the Studios allege that the Hailuo AI tool's 6- to 10-second video outputs, which the Studios manipulated the tool to create, depict *characters* that appear in the Studios' registered works.  Compl. ¶¶ 38-109.

To proceed, the Studios must establish that they have registrations covering the characters that they allege Nanonoble infringed.  Copyright registration is a prerequisite for a copyright infringement claim.  17 U.S.C. § 411(a).  Here, the Studios do not allege that they hold any registrations that cover the characters at issue.  Instead, they rely on registrations for works in which those characters merely appeared, *see* Compl. Exs. A, B, C, and assert in conclusory fashion that those registrations "encompass the central characters therein," *see id*. ¶¶ 38-109.  But a registration for an audiovisual work "does not cover the character *per se.*"  *Compendium of U.S. Copyright Office Practices* § 313.4(h) (3d ed. 2021).  And the Studios allege no facts to show the cited registrations "encompass" any (let alone all) of the characters depicted therein.

Here, the Studios' cited registrations are largely irrelevant.  Most are for derivative works—sequels, spin-offs, and later seasons—that cannot cover characters depicted in earlier works (assuming that the earlier registrations covered the characters).  A copyright in a derivative work "extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work."  17 U.S.C. § 103(b).  "[S]ubsequent works in a series (or sequels) are in a sense derivative works," while the "characters which

appear throughout the series are a part of the underlying [initial] work upon which the later works are based." *Siegel v. Warner Bros. Ent. Inc.*, 690 F. Supp. 2d 1048, 1059 (C.D. Cal. 2009).

For example, a registration for a recent *The Simpsons* episode protects only that episode's unique creative additions, not the creative content first expressed decades ago, *e.g.*, the main characters. Yet nowhere in their Complaint do the Studios distinguish the cited works based on their content. Instead, they merely attached a list of registrations and the characters that they claim those registrations cover. *See, e.g.*, Compl. Ex. A (listing copyright registrations for 1980 through 2022 works depicting "Darth Vader" without explaining their specific protectible expression); *id.*, Ex. B (same for works depicting "Batman" from 1940 through 2023). By failing to map the allegedly infringed characters to the registrations that supposedly cover them, the Studios leave the Court and Nanonoble guessing as to the basis of their claims—a pleading failure that demands dismissal under *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And by no measure have the Studios sufficiently alleged a copyright registration that applies to each character at issue.

**B.     The Studios Fail To Plausibly Allege Copyrightable Characters.**

The Studios' claims rest on the copyrightability of the characters in their films and television programs. But "characters are ordinarily not afforded copyright protection." *Rice v. Fox Broad. Co.*, 330 F.3d 1170, 1175 (9th Cir. 2003) *overruled on other grounds by Skidmore as Tr. for Randy Craig Wolfe Tr. v. Led Zeppelin*, 952 F.3d 1051, 1067 (9th Cir. 2020). A character is protectable only if it satisfies either the "especially distinctive" or "story being told" tests. *Id.* at 1175. The Studios fail to plead facts satisfying either test. *See Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991) (plaintiff must prove ownership of valid copyright in allegedly infringed work).

### 1.   The Studios Fail The "Especially Distinctive" Test.

Under the especially distinctive test, a character is protectable if it: (a) has physical and conceptual qualities, (b) is sufficiently delineated and displays consistent, identifiable character traits and attributes, and (c) is especially distinctive and contains some unique expression. *Carroll Shelby Licensing, Inc. v. Halicki*, 138 F.4th 1178, 1183 (9th Cir. 2025) (quotation omitted) (affirming that the car character "Eleanor" from *Gone in 60 Seconds* was not protectable where it lacked conceptual qualities and consistent traits beyond physical appearance). Dismissal is proper where a complaint fails to allege sufficient physical or conceptual qualities. *Daniels v. Walt Disney Co.*, 958 F.3d 767, 771-72 (9th Cir. 2020).

Here, the Studios do not plead the necessary "consistent, identifiable character traits" required to allege copyrightability of the identified characters. *Carroll*, 138 F.4th at 1183. Rather than alleging specific conceptual traits, they provide only character names and conclusory labels. For example, the Studios identify "R2-D2," "C-3PO," "Chewbacca," "Deadpool," "Groot," "Wolverine," and "Captain America" only as "iconic central characters." Compl. ¶¶ 44, 51. The Studios do not allege any traits of "Marge," "Lisa," or "Maggie" Simpson, while they provide only physical descriptions of "Daffy Duck" and "Tweety" without any conceptual traits. *Id.* ¶¶ 53, 76.

Even where the Studios allege *some* traits concerning *some* characters, they rely primarily on insufficient superficial physical traits rather than conceptual traits. For instance, the Studios define "Lightning McQueen" merely by his paint job ("a red race car with a yellow lightning bolt"), the "Minions" by their "accessories" ("metal goggles"), and "Shrek" by his physique ("large, bald, dull-green ogre"). *See* Compl. ¶¶ 57, 95, 99. Other character allegations are no better, as they rely on stock archetypes or relationships rather than distinct personality traits. By defining "The Joker" solely as "Batman's archenemy" or "Toothless" as "the dragon who belongs to Hiccup," the Studios identify plot functions, not protectable characters. *Id.* ¶¶ 69,

102.  Because the Studios fail to plead the "unique elements of expression" that distinguish these figures from generic concepts, they fail to state a claim for character infringement.  *See Daniels*, 958 F.3d at 771-72.

### 2.    The Studios Fail The "Story Being Told" Test.

Under the alternative "story being told" test, a character is protectible if it "constitutes the story being told" instead of serving as "only the chessman in the game of telling the story."  *Warner Bros. Pictures, Inc. v. Columbia Broad. Sys., Inc.*, 216 F.2d 945, 950 (9th Cir. 1954).  In *Warner Bros.*, the Ninth Circuit held that Sam Spade—the protagonist of *The Maltese Falcon*—was not protectable.  *Id.*  He was merely a "figure" used to tell a detective story, not the story itself.  *Id.* at 949-50.  This remains "a high bar, since few characters so dominate the story such that it becomes essentially a character study."  *Daniels*, 958 F.3d at 774.

The Studios' allegations are likewise defective.  At most, they assert that the characters are "central" to the Studios' works.  *See* Compl. ¶¶ 40, 43, 51, 94, 102.  That is not enough.  *Warner Bros.* held that even a prominent protagonist is not protectable under this test.  216 F.2d at 949-50.  The Studios do not allege that any work is a "character study" with "prolonged engagement with character development."  *Daniels*, 958 F.3d at 774.  Instead, they describe story-worlds and plot-driven franchises—*e.g.*, *Star Wars* as "an epic space odyssey" spanning "multiple eras" (Compl. ¶ 41)—in which these characters are "chessmen in the game of telling the story."  *Warner Bros.*, 216 F.2d at 950.  Because the Studios fail to allege copyrightable characters, their Complaint fails to state a claim.

## II.    THE STUDIOS FAIL TO STATE A CLAIM FOR DIRECT INFRINGEMENT

### A.    The Studios' Training Allegations Fail.

The Training Allegations fail to support the Studios' direct infringement claim because the Studios do not allege that scraping, data processing, or model training occurred within the U.S.  The Copyright Act does not apply to "acts of

infringement that take place entirely abroad." *Subafilms, Ltd. v. MGM-Pathe Commc'ns Co.*, 24 F.3d 1088, 1098 (9th Cir. 1994) (en banc).  To survive dismissal, the Studios must allege that "at least one alleged infringement [was] completed entirely within the United States."  *Allarcom Pay Television. Ltd. v. Gen. Instrument Corp.*, 69 F.3d 381, 387 (9th Cir. 1995).  They have not done so.

The Studios admit that Nanonoble is a foreign entity, headquartered in Singapore, with no offices, employees, or servers in the U.S.  Compl. ¶¶ 32-34.  Consistent with this, the Studios are conspicuously silent about the location of the conduct constituting the Training Allegations.  They allege only that their works were downloaded "from the internet."  *Id.* ¶ 162(a).  But "the internet" is not a location within the U.S.  The Studios fail to allege that any scraping, storage, cleaning, or training occurred in the U.S.  The only plausible inference is that this conduct occurred in Asia where Hailuo AI was developed, outside the scope of U.S. copyright law.

The Studios cannot salvage their Training Allegations by pointing to third-party infrastructure used to deliver outputs to U.S. users.  Although the Studios allege that Cloudflare servers in the U.S. cache video outputs *after* users generate a video (Compl. ¶ 36(e)), they do not allege that Nanonoble processed *training data* on U.S. servers.  Caching user-generated outputs in the U.S. does not convert foreign training conduct into a domestic act of infringement.  To hold otherwise would allow copyright claims based on U.S. users accessing a foreign service via the internet, "destroy[ing] the concept of territoriality inherent in the Copyright Act." *Perfect 10, Inc. v. Yandex N.V.*, 962 F. Supp. 2d 1146, 1153 (N.D. Cal. 2013).

**B.**    **<u>The Studios' Output Allegations Fail.</u>**

**1.**    **The Studios Rely On Non-Actionable Video Outputs That The Studios Created With The Hailuo AI Tool.**

Most of the Output Allegations fail because the Studios—not Nanonoble or any third party—created the outputs at issue.  *See* Compl. ¶¶ 118-160.  The Studios

rely on 52 video outputs that exist only because the Studios or their agents created them using the Hailuo AI tool.  But a copyright "owner cannot infringe his own copyright."  *Richmond v. Weiner*, 353 F.2d 41, 44, 46 (9th Cir. 1965).

Each of the 52 instances of alleged direct infringement begins with the phrase "[i]n response to the prompt," followed by the text of a prompt identifying the Studios' characters by name (*e.g.*, "Yoda with lightsaber, IMAX").  *See* Compl. ¶¶ 118-160.  The Studios do not allege that Nanonoble or any third-party subscriber submitted these prompts—likely because the Studios cannot make that allegation consistent with Rule 11.  Nanonoble has confirmed that user accounts tied to employees at Jenner & Block LLP (the Studios' counsel) submitted the prompts identified in Paragraphs 118 through 160.  *See* Posner Decl. ¶ 4.  The Complaint thus shows no more than what users theoretically can do with the tool.

This defect eliminates the vast majority of the Output Allegations.  The only other direct infringement allegations concern the "Explore" page on Hailuo AI's website and the Complaint's distorted selection of social media posts.  *See* Compl. ¶¶ 169-89.  But these allegations add little: the Explore page merely displays content that users—not Nanonoble—created (*see infra* § II.B.2), and the social media posts amount to just 13 of more than 7,834 total posts across Hailuo AI's four social media accounts—meaning less than 0.17% of Hailuo AI's social media output depict any of the Studios' characters.  Posner Decl. ¶ 5; *see Knievel*, 393 F.3d at 1076 (permitting consideration of website content that a complaint cites and relies upon).  Even if the Studios could allege that the characters on the Explore page and in those posts are copyrightable and registered (*see supra* § I), that would support claims for those images only, which are likely fair use.  *See, e.g.*, *DraftExpress, Inc. v. Whistle Sports, Inc.*, 2022 WL 16962285, at *5 (C.D. Cal. Aug. 2, 2022) (finding social media post that included an excerpt of a copyrighted video was fair use as a matter of law).

## 2.    The Output Allegations Lack Volitional Conduct.

The Studios' Output Allegations separately fail for lack of alleged volitional conduct.  This is because users—not Nanonoble—create videos using the tool.

To prevail on a direct infringement claim, a plaintiff "must establish causation, which is commonly referred to as the 'volitional conduct requirement.'" *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019).   This requirement "takes on greater importance" when a defendant "does nothing more than operate an automated, user-controlled system." *Id.* at 731-32 (quotation omitted).  In such cases, the critical question is "who selects the copyrighted content: the defendant or its customers." *Id.* (quotation omitted).  Direct liability attaches only when the defendant—not its users—"instigated any copying, storage, or distribution." *Id.* (quotation omitted).

The Ninth Circuit's decision in *Fox Broadcasting Co. v. Dish Network, L.L.C.*, is dispositive.  747 F.3d 1060 (9th Cir. 2014).  There, the court held that Dish was not liable for direct infringement for automatically recording copies of primetime programming through its PrimeTime Anytime feature.  *Id.* at 1067-68.  Although Dish exercised significant control—deciding which channels to record and how long copies remained available—the court found no direct liability because "the user, not Dish, makes the copy" and so the trial court did not abuse its discretion by finding the user is "the most significant and important' cause of the copy." *Id.* at 1067 n.3.

That reasoning applies here.  The Studios confirm that users drive the process: to create a video with the Hailuo AI tool, subscribers must direct the tool by "submit[ting] a simple text prompt" that describes the specific content users want to create.  Compl. ¶ 6.  Each alleged infringement follows this user-driven pattern. *Id.* ¶¶ 118, 125, 129.  As in *Dish*, none of Nanonoble's employees are involved.

The Hailuo AI Explore page is no different.  The Studios allege that it "displays and performs … various videos previously generated by [the Hailuo AI

13    Case No. 2:25-cv-08768-SB-E

tool] for other subscribers." Compl. ¶ 189. But that is not sufficient. In *VHT*, the Ninth Circuit held that Zillow's display of user-uploaded photographs did not constitute volitional conduct because third parties selected the content and Zillow exercised no control "beyond the general operation of its website." 918 F.3d at 733 (quotation omitted). The court found volitional conduct only where **Zillow's employees** "curated, selected, and tagged" specific photos for use. *Id.* at 737. Here, the Studios allege no comparable curation—no reviewing, selecting, or tagging—by Nanonoble. *See* Compl. ¶¶ 115, 189-93. Because users select and initiate each output, and the Explore page merely displays user-generated content without human curation, the Output Allegations fail to support a claim for direct infringement.

## III.    THE STUDIOS FAIL TO STATE A CLAIM FOR SECONDARY INFRINGEMENT

### A.    The Studios Fail To Plausibly Allege Third-Party Infringement.

The Studios allege that Nanonoble is responsible for infringing outputs that Hailuo AI's users created. Compl. ¶ 228. Secondary liability requires direct infringement by a third party. *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1169 (9th Cir. 2007). A plaintiff cannot prevail "on any theory of secondary liability" absent such third-party direct infringement. *Hunley v. Instagram, LLC*, 73 F.4th 1060, 1077 (9th Cir. 2023). "There can, by definition, be no contributory liability if that conduct which is aided by the putative contributory infringer is not itself infringing." *Subafilms*, 24 F.3d at 1092 (quoting 3 David Nimmer & Melville B. Nimmer, Nimmer on Copyright § 12.04[A][2][b], at 12–81 (1993)).

The Studios fail to identify sufficient third-party infringement. Most of the alleged "infringements"—the 52 outputs in Paragraphs 118 through 160—are works that **the Studios** created. They describe these outputs as generated "[i]n response to" specific prompts but fail to allege "by whom." Compl. ¶¶ 118-60. As explained in § II.B, the Studios or their agents entered these prompts, which concern their own content. Authorized conduct cannot constitute infringement. *See Sony Corp. of Am.*

14                    Case No. 2:25-cv-08768-SB-E

*v. Universal City Studios, Inc.*, 464 U.S. 417, 433 (1984). These self-generated outputs cannot serve as predicate acts of third-party direct infringement for secondary liability.

As noted, *supra* at 12, apart from these manufactured outputs, the Studios identify virtually no third-party infringement. The Studios point to just 9 social media posts by third parties. *See* Compl. ¶¶ 170-73, 186-87, 194-99; Posner Decl. ¶ 5. But the Studios have not alleged that the characters depicted in those posts are copyrightable or covered by the Studios' registrations. *See supra* § I. And as an indicator of whether Hailuo users are infringing the Studios' content, the miniscule volume—9 posts across all social media—pales in comparison to the massive user infringement at issue in cases such as *Napster* and *Grokster*. *See A&M Recs., Inc. v. Napster, Inc.*, 239 F.3d 1004, 1025 (9th Cir. 2001) ("as many as 10,000 [copyrighted] files per second" were exchanged on Napster's site) (quotation omitted); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 922-23 (2005) ("nearly 90%" of "billions of files" exchanged monthly on defendant's service were copyrighted). The remaining allegations—posts on Hailuo AI's social media accounts (Compl. ¶¶ 169, 174-85) and the Explore page (*id*. ¶ 189)—describe Nanonoble's own display of content, not third-party infringement.

**B.  The Studios Fail To State A Claim Based On Vicarious Liability.**

To state a claim for vicarious infringement, a plaintiff must allege that the defendant "has (1) the right and ability to supervise the infringing conduct and (2) a direct financial interest in the infringing activity." *VHT*, 918 F.3d at 746. The defendant must have the practical and technical ability to identify or screen out infringing material. *Id.* A failure to change operations to avoid distributing infringing content "is not the same as declining to exercise a right and ability" to stop infringement. *Id.* (quotation omitted). The Studios fail to allege either element.

Case No. 2:25-cv-08768-SB-E

MOTION TO DISMISS DEFENDANT NANONOBLE PTE. LTD. PURSUANT TO FED. R. CIV. P. 12(b)(6)

**1.      The Complaint Fails To Plausibly Allege That Nanonoble Has The Right And Ability To Control Infringement.**

*First*, the Studios' allegation that Nanonoble controls training-data selection (Compl. ¶ 234) is insufficient.  Vicarious liability requires control over the direct infringer's conduct, not the antecedent steps.  If, as the Studios allege, subscribers are the direct infringers, the infringing acts are their prompts and downloads, not earlier training decisions.  *See Cobbler Nev., LLC v. Gonzales*, 901 F.3d 1142, 1148-49 (9th Cir. 2018) ("providing internet access" does not confer control over internet users' infringing conduct).  Regardless of how the Hailuo AI model was trained, that does not mean that Nanonoble has any control over what the end users do with it.

*Second*, the Studios allege that Nanonoble can control prompts because Hailuo AI blocks violence and pornography and employs a "Prompt Optimizer." Compl. ¶¶ 204-07, 235-36.  But the ability to block those types of outputs does not establish the ability to police copyright infringement.  Identifying whether a prompt such as "hero in a red cape" will infringe requires case-by-case legal analysis, even if the copyright is readily identifiable.  *See Amazon.com, Inc.*, 508 F.3d at 1173-74 (Google lacked ability to supervise infringement on third-party websites even though it could block access to them).  A company's ability to police for non-copyright purposes does not create a duty to police for all purposes, including copyright infringement.  *Id.* at 1174.

*Third*, knowledge does not establish control.  The Studios allege that Nanonoble has "actual knowledge" of infringement through Hailuo AI's Explore page and the Studios' cease-and-desist letter.  Compl. ¶¶ 189-91, 208-09, 240.  But knowledge of infringement does not establish control for vicarious liability. *Amazon*, 508 F.3d at 1173-74 (holding that Google's right to terminate infringer deals did not "give Google the right to stop direct infringement by third-party websites").

MOTION TO DISMISS DEFENDANT NANONOBLE PTE. LTD. PURSUANT TO FED. R. CIV. P. 12(b)(6)

**2.      The Studios Fail To Allege Direct Financial Benefit.**

Vicarious liability requires "a causal relationship between the infringing activity and any financial benefit a defendant reaps." *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th Cir. 2004). The Studios must plausibly allege that the *specific* infringements—not infringement generally—draw subscribers. *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 673 (9th Cir. 2017) ("the direct financial benefit prong … demands more than evidence that customers were drawn to [defendant] [for] infringing material in general") (quotation omitted).

The Studios have not done so and cannot. Hailuo AI charges a flat fee based on credits and features—not on content generated. Compl. ¶¶ 111-14, 238. A flat fee for access to a service with infringing and noninfringing uses does not constitute a direct financial benefit from infringement. *Amazon*, 508 F.3d at 1173; *see also Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) ("receiving a one-time set-up fee and flat, periodic payments for service from a person engaging in infringing activities would not constitute receiving a financial benefit") (quotation omitted). Because Nanonoble receives the same revenue whether users create infringing outputs or something else, the revenue is not "directly attributable to" the alleged infringement.

The Studios' conclusory allegation that the ability to use Hailuo AI to generate the Studios' characters "is plainly an attraction and a draw for subscribers" is insufficient. Compl. ¶ 237. The Studios do not allege what share of outputs involve their works, how many (if any) subscribers use the service for this purpose, or whether any subscribers would use the service absent this capability. Absent such allegations, the Studios fail to plausibly allege the required causal link. *See Giganews*, 847 F.3d at 673 (rejecting financial benefit where plaintiff failed to show customers subscribed because of specific copyrighted images).

C.      **The Studios Fail To State A Claim For Contributory Liability.**

The Studios fail to plausibly allege contributory infringement.  A plaintiff must allege that the defendant "intended that the provided service be used for infringement."  *Cox*, 146 S. Ct. at 967.  That intent can be shown only if the "service is tailored to that infringement" or the defendant "induced the infringement."  *Id.* at 968 (citations omitted).  A service is tailored to infringement only where it is "not capable of 'substantial' or 'commercially significant' noninfringing uses."  *Id.* at 967 (quotation omitted).  A provider induces infringement only where it "actively encourages infringement through specific acts."  *Id.*  Mere "knowledge that a service will be used to infringe is insufficient to establish the required intent."  *Id.* at 968

1.      **Hailuo AI Is Capable Of Substantial Noninfringing Uses.**

The Studios cannot state a claim based on a "tailoring" theory because Hailuo AI is capable of substantial noninfringing uses.  Liability on a tailoring theory attaches only when the product is "not capable of 'substantial' or 'commercially significant' noninfringing uses."  *Cox*, 146 S. Ct. at 967 (quoting *Grokster*, 545 U.S. at 942 (Ginsburg, J., concurring)).

The Studios admit that Hailuo AI has substantial noninfringing uses.  They acknowledge that it is an "AI image and video generating service" that lets users "just type what you want."  Compl. ¶¶ 1, 171; *see also supra* at 2; Compl. ¶ 189 (screenshots depicting content generated with prompts such as "an animated scene featuring an owl working as a hospital administrator," among others).  The Studios do not allege that Hailuo AI functions only when prompted to generate infringing content.  Nor could they.  Whether an output infringes depends on the user's prompt.  *Id.* ¶ 6.  The Studios also admit that the Explore page displays noninfringing content by pointing to a "Zombie attack scene," a "cinematic time-lapse video capturing a panoramic view of a modern city skyline at sunset," and an "animated scene featuring an owl working as a hospital administrator."  *Id.* ¶ 189.  Each of those outputs is a lawful, noninfringing use unrelated to the Studios' works.

These allegations describe a broad, general-purpose tool that falls outside the tailoring theory.

### 2.     The Studios Fail To Plausibly Allege Inducement.

The Studios fail to allege inducement because they identify no act by Nanonoble encouraging any user to infringe.  A provider "induces infringement" when it "actively encourages infringement through specific acts."  *Cox*, 146 S. Ct. at 968.  In *Grokster*, the Court found inducement because the "principal object" of the defendants' business was infringing use and the defendants promoted and marketed their software as a tool to infringe copyrights.  545 U.S. at 924-26.  The Studios' allegations fall short.

*First*, infringement is not the "principal object" of Nanonoble's business.  The Studios' screenshots of Hailuo AI's Explore page show that the overwhelming majority of displayed content does not infringe.  Compl. ¶ 189.  In *Grokster*, by contrast, "nearly 90%" of "billions of files" exchanged monthly on the defendant's service were copyrighted.  545 U.S. at 922-23.  Nothing in the Complaint even suggests that infringing outputs make up anything close to a meaningful share of Hailuo AI's total output.

*Second*, the Studios do not plausibly allege "express promotion, marketing, and intent to promote" infringement.  *Cox*, 146 S. Ct. at 968 (quoting *Grokster*, 545 U.S. at 926).  Their principal basis is Hailuo AI's tagline: "a Hollywood studio in your pocket."  Compl. ¶ 1.  That phrase describes quality and creative capability.  It says nothing about making copies of the Studios' works, tells no user how to generate outputs that include copyrighted characters, and communicates no message "designed to stimulate others to commit violations."  *Grokster*, 545 U.S. at 937.

The Supreme Court rejected a stronger basis for inducement in *Sony*.  As the dissent noted: "The District Court found that Sony has advertised the Betamax as suitable for off-the-air recording of 'favorite shows,' 'novels for television,' and 'classic movies.'"  464 U.S. at 489-90 (Blackmun, J., dissenting).  The dissent

would have found inducement on that basis, but the majority disagreed. *Id.* at 442. If those statements, which directly refer to using the product to infringe, are not sufficient to constitute inducement, the tagline "A Hollywood studio in your pocket" is not sufficient, either.

The Hailuo AI tagline is as consistent with lawful marketing as it is with any intent to induce infringement—and that is not enough. *See Twombly*, 550 U.S. at 554, 557 (2007) (dismissing complaint where alleged conduct "stops short of the line between possibility and plausibility" because it was equally consistent with lawful behavior). The *Grokster* defendants, by contrast, "clearly voiced the objective that recipients use [the software] to download copyrighted works" and advertised their services as alternatives to the unlawful Napster service. 545 U.S. at 924, 938. The Studios allege nothing comparable here.

**Third**, the Studios' social media allegations do not show inducement. The Studios point to posts on Hailuo AI's social media accounts that depict characters from the Studios' works. Compl. ¶¶ 169, 174-89. But scattered references to copyrighted characters in a company's social media feed do not show that the company promoted its product for the purpose of infringement. "Generally applicable tools and messages for users" do not "promote[] the use of [the product] specifically to infringe copyrights." *Amazon.com*, 508 F.3d at 1170 n.11; *see also VHT*, 918 F.3d at 746 (applying same principle). The numbers confirm this: just 13 of more than 7,834 total posts across Hailuo AI's four social media accounts—less than 0.17% of the total—mention the Studios' works at all. Posner Decl. ¶ 5. At most, these posts advertise the types of content available through Hailuo AI and the tool to create it—just as the defendant in *Giganews* advertised "25,000 terabytes" of downloadable content, including "music, pictures, and movies," and the tools to access it. 847 F.3d at 672. The Ninth Circuit deemed that extent of infringing activity to be "entirely inconclusive" because nothing showed the defendant

20    Case No. 2:25-cv-08768-SB-E

promoted its product "with the object" of infringing copyright. *Id.* The comparable level of activity at issue here is, by comparison, microscopic.

**Fourth**, the Studios do not allege that Nanonoble took any affirmative step to target, attract, or assist users seeking to infringe—for example, by advertising the ability to reproduce the Studios' works, instructing users on how to generate copyrighted characters, or purchasing keywords to attract users seeking pirated content. The *Grokster* defendants took each of those steps: They distributed their software to capture "former Napster users" seeking to infringe and inserted digital codes so users searching for "Napster" or "free filesharing" would land on their websites. 545 U.S. at 924-26. The Studios allege no comparable conduct by Nanonoble.

**Fifth**, the Studios' allegations of knowledge and content-filtering capability do not state an inducement claim. The Studios allege that Nanonoble has "actual knowledge" of infringement based on the Explore page and a cease-and-desist letter. Compl. ¶¶ 189-91, 208-09. The Supreme Court's March 25 *Cox* decision forecloses that theory: Mere "knowledge that a service will be used to infringe is insufficient to establish the required intent to infringe." 146 S. Ct. at 968. The Studios also allege that Hailuo AI blocks violence and pornography and uses a "Prompt Optimizer." Compl. ¶¶ 204-07. But the ability to filter content for non-copyright purposes does not create a duty to filter for copyright infringement—and failing to do so is not an affirmative act encouraging infringement. *See Grokster*, 545 U.S. at 939 n.12 (holding that "a court would be unable to find contributory infringement liability merely based on a failure to take affirmative steps to prevent infringement").

## CONCLUSION

The Studios' Complaint is legally defective. No amended pleading can cure its defects. The Court should dismiss the Complaint with prejudice.

Motion to Dismiss Defendant Nanonoble Pte. Ltd. Pursuant to Fed. R. Civ. P. 12(b)(6)

Dated:  April 10, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART
    & SULLIVAN, LLP
Robert M. Schwartz
Daniel C. Posner
Aaron Perahia
Moon Hee Lee
Bradley Kahn

By: _____
        Robert M. Schwartz
*Attorneys for Defendant Nanonoble*

MOTION TO DISMISS DEFENDANT NANONOBLE PTE. LTD. PURSUANT TO FED. R. CIV. P. 12(b)(6)

**CERTIFICATE OF L.R. 11-6.1 COMPLIANCE RE: WORD COUNT**

The undersigned, counsel of record for Defendant Nanonoble certifies that this brief contains 6,516 words, which complies with the word limit of L.R. 11-6.1.

Dated:  April 10, 2026

Respectfully submitted,

QUINN EMANUEL URQUHART
   & SULLIVAN, LLP
Robert M. Schwartz
Daniel C. Posner
Aaron Perahia
Moon Hee Lee
Bradley Kahn

By: _____
   Robert M. Schwartz
*Attorneys for Defendant Nanonoble*

MOTION TO DISMISS DEFENDANT NANONOBLE PTE. LTD. PURSUANT TO FED. R. CIV. P. 12(b)(6)