**JENNER & BLOCK LLP**
David R. Singer (SBN 204699)
dsinger@jenner.com
Julie A. Shepard (SBN 175538)
jshepard@jenner.com
Andrew J. Thomas (SBN 159533)
ajthomas@jenner.com
Lauren M. Greene (SBN 271397)
lgreene@jenner.com
515 South Flower Street, Suite 3300
Los Angeles, CA  90071-2246
Telephone: (213) 239-5100
Facsimile:  (213) 239-5199

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DISNEY ENTERPRISES, INC.; UNIVERSAL CITY STUDIOS PRODUCTIONS LLLP; WARNER BROS. ENTERTAINMENT INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> MINIMAX, et al., <br><br> Defendants. | Case No. 2:25-cv-08768-SB-E <br><br> Hon. Judge Stanley Blumenfeld, Jr. <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)** <br><br> Date:  May 29, 2026 <br> Time: 8:30 a.m. <br> Ctrm:  6C <br><br> Trial Date: not set |

## TABLE OF CONTENTS

I. INTRODUCTION .........................................................................................................1

II. STANDARDS FOR RULE 12(b)(6) MOTIONS .................................................2

III. ARGUMENT ............................................................................................................3

    A.    Plaintiffs Have Sufficiently Alleged Their Ownership of the Iconic Characters Identified in the Complaint. ....................................................3

        1.    It is well established that fictional characters can be separately protected by copyright law.......................................................3

        2.    Plaintiffs have sufficiently alleged that the characters identified in the Complaint are protected by copyright. ...........................4

        3.    Plaintiffs have sufficiently alleged copyright registrations covering the characters at issue.............................................6

    B.    Plaintiffs Have More Than Adequately Alleged Direct Infringement by Defendants. .......................................................................................7

        1.    Defendants' vague assertions about extraterritorial copying at the training stage do not warrant dismissal.............................7

        2.    Plaintiffs did not "authorize" infringement by using investigators to collect evidence of Defendants' copyright violations. .......................................................................10

        3.    The Complaint describes in detail how Defendants are volitional actors.................................................................11

            a.    Defendants satisfy all elements of the Ninth Circuit's volition standard. ...........................................12

            b.    Defendants' conduct goes far beyond operation of a passive, automated system.......................................14

    C.    Defendants' Arguments on Plaintiffs' Claims in the Alternative for Secondary Liability Do Not Remotely Warrant Dismissal.......................15

        1.    Plaintiffs have sufficiently alleged vicarious liability. .....................17

        2.    Plaintiffs have sufficiently alleged contributory infringement..........19

IV. CONCLUSION..........................................................................................22

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&M Records v. Napster*,
239 F.3d 1004 (9th Cir. 2001) ................................................................. 11, 17

*Advance Local Media v. Cohere*,
2025 WL 3171892 (S.D.N.Y. Nov. 13, 2025)...................................................... 16

*Amazon Content Servs. v. DeBarr*,
793 F. Supp. 3d 1242 (C.D. Cal. 2025) ............................................................. 20

*Anderson v. Intel Corp. Inv. Policy Comm.*,
137 F.4th 1015 (9th Cir. 2025) ........................................................................ 2

*Anderson v. Stallone*,
1989 WL 206431 (C.D. Cal. Apr. 25, 1989) ......................................................... 3

*Arista Records v. Lime Group*,
784 F. Supp. 2d 398 (S.D.N.Y. 2011) ............................................................... 21

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)......................................................................................... 2

*Atari Interactive v. Redbubble, Inc.*,
515 F. Supp. 3d 1089 (N.D. Cal. 2021)............................................................. 13

*Atlantic Recording Corp. v. Howell*,
554 F. Supp. 2d 976 (D. Ariz. 2008) ................................................................ 10

*Bell v. Wilmot Storage Servs.*,
12 F.4th 1065 (9th Cir. 2021) .......................................................................... 12

*Biani v. Showtime Networks*,
2024 WL 6836918 (C.D. Cal. Mar. 29, 2024)..................................................... 5

*BMI v. QM Entertainment*,
2026 WL 972408 (W.D. Wash. Apr. 10, 2026) ................................................... 18

*Browne v. Donalds*,
2024 WL 3468898 (C.D. Cal. May 28, 2024)...................................................... 6

*Browne v. McCain*,
    612 F. Supp. 2d 1125 (C.D. Cal. 2009) ........................................................... 17

*Burroughs v. Metro-Goldwyn-Mayer Inc.*,
    519 F. Supp. 388 (S.D.N.Y. 1981), *aff'd*, 683 F.2d 610 (2d Cir. 1982) ...................... 5

*Carroll Shelby Licensing v. Halicki*,
    138 F.4th 1178 (9th Cir. 2025) ....................................................................... 5

*Columbia Pictures Industries v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ................................................................. 20, 21

*Corelogic Solutions, LLC v. Credifi Corp.*,
    2021 WL 1156860 (C.D. Cal. Jan. 29, 2021) ...................................................... 6

*Cox Communications, Inc. v. Sony Music Entertainment*,
    146 S. Ct. 959 (2026) ................................................................................. 19

*Crunchyroll v. Pledge*,
    2014 WL 1347492 (N.D. Cal. Mar. 31, 2014) ..................................................... 8

*Daniels v. Walt Disney Co.*,
    958 F.3d 767 (9th Cir. 2020) ..................................................................... 3, 4

*David v. CBS Interactive*,
    2012 WL 12884914 (C.D. Cal. July 13, 2012) ................................................... 20

*DC Comics v. Towle*,
    802 F.3d 1012 (9th Cir. 2015) ................................................................. 3, 4, 5

*Desire, LLC v. Manna Textiles, Inc.*,
    986 F.3d 1253 (9th Cir. 2021) ..................................................................... 12

*Dish Network v. Jadoo TV, Inc.*,
    2023 WL 4004115 (N.D. Cal. June 13, 2023) ................................................... 14

*Dunham v. Lei*,
    2021 WL 4595808 (C.D. Cal. June 7, 2021) ..................................................... 20

*Ellison v. Robertson*,
    357 F.3d 1072 (9th Cir. 2004) ..................................................................... 17

*EMI Christian Music Group v. MP3Tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016) ......................................................................... 13

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

*Esmark, Inc. v. N.L.R.B.*,
  887 F.2d 739 (7th Cir. 1989) ................................................................................9

*Facebook Inc. v. Namecheap Inc.*,
  2020 WL 6585534 (D. Ariz. Nov. 10, 2020) .......................................................9

*Fonovisa, Inc. v Cherry Auction*,
  76 F.3d 259 (9th Cir. 1996) ...........................................................................17, 18

*Four Navy Seals v. Associated Press*,
  413 F. Supp. 2d 1136 (S.D. Cal. 2005) ..............................................................17

*Fox Broadcasting v. Dish*,
  747 F.3d 1060 (9th Cir. 2014) ............................................................................14

*Hotaling v. Church of Jesus Christ of Latter-Day Saints*,
  118 F.3d 199 (4th Cir. 1997) ..............................................................................11

*Hybrid Promotions, LLC v. Zaslavsky*,
  2016 WL 10988656 (C.D. Cal. Oct. 5, 2016) ......................................................6

*Ideal Toy Co. v. Kenner Products*,
  443 F. Supp. 291 (S.D.N.Y. 1977) .......................................................................6

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ..............................................................................10

*KTS Karaoke, Inc. v. Sony ATV Music Publ'g*,
  2012 WL 12887300 (C.D. Cal. Aug. 22, 2012) ...................................................6

*Kuhmstedt v. Enttech Media Grp.*,
  2022 WL 1769126 (C.D. Cal. Apr. 11, 2022) ......................................................6

*Live Face on Web, LLC v. Roshdieh*,
  2016 WL 11505589 (C.D. Cal. Nov. 16, 2016) ..................................................17

*Los Angeles News Serv. v. Conus Commc'ns Co.*,
  969 F. Supp. 579 (C.D. Cal. 1997) ......................................................................8

*Metro-Goldwyn-Mayer Studios v. American Honda Motor*,
  900 F. Supp. 1287 (C.D. Cal. 1995) ....................................................................4

*Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*,
  545 U.S. 913 (2005)...............................................................16, 19, 20, 21

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

*Microsoft Corp. v. Rivera*,
2019 WL 1641349 (C.D. Cal. Apr. 16, 2019) ................................................................. 10

*Moonbug Ent. v. BabyBus (Fujian) Network Tech. Co.*,
2023 WL 11922845 (N.D. Cal. Mar. 7, 2023) ................................................................. 5

*National Football League v. PrimeTime 24 Joint Venture*,
211 F.3d 10 (2d Cir. 2000) ................................................................. 8

*New York Times v. Microsoft*,
777 F. Supp. 3d 283 (S.D.N.Y. 2025) ................................................................. 16

*Perfect 10, Inc. v. Amazon.com*,
508 F.3d 1146 (9th Cir. 2007) ................................................................. 11, 17

*Perfect 10, Inc. v. Giganews, Inc.*,
847 F.3d 657 (9th Cir. 2017) ................................................................. 12, 17

*Ryan v. CARL Corp.*,
23 F. Supp. 2d 1146 (N.D. Cal. 1998) ................................................................. 10

*Sapon v. DC Comics*,
2002 WL 485730 (S.D.N.Y. Mar. 29, 2002) ................................................................. 5

*Shropshire v. Canning*,
809 F. Supp. 2d 1139 (N.D. Cal. 2011) ................................................................. 8

*Sony Corp. v. Universal City Studios*,
464 U.S. 417 (1984) ................................................................. 19, 20

*Soo Park v. Thompson*,
851 F.3d 910 (9th Cir. 2017) ................................................................. 2

*Sound N Light Animatronics. v. Cloud B, Inc*,
2017 WL 3081685 (C.D. Cal. Apr. 7, 2017) ................................................................. 8

*Spanski Enterprises v. Telewizja Polska, S.A.*,
883 F.3d 904 (D.C. Cir. 2018) ................................................................. 8

*Summit Kaiju LLC v. Legend Pictures*,
2022 WL 2235460 (C.D. Cal. Apr. 12, 2022) ................................................................. 3, 5

*Toho Co. v. William Morrow & Co.*,
33 F. Supp. 2d 1206 (C.D. Cal. 1998) ................................................................. 5

v

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

*United States v. Bestfoods*,
    524 U.S. 51 (1998) ................................................................................................. 9

*VHT, Inc. v. Zillow Group*,
    918 F.3d 723 (9th Cir. 2019) ...................................................................... 12, 13, 14

*Walt Disney Productions v. Air Pirates*,
    581 F.2d 751 (9th Cir. 1978) ............................................................................... 3, 4

*Warner Bros. Inc. v. American Broad. Cos.*,
    720 F.2d 231 (2d Cir. 1983) ..................................................................................... 5

*Williams-Sonoma, Inc. v. Amazon.com*,
    627 F. Supp. 3d 1072 (N.D. Cal. 2020) ....................................................... 2, 12, 13

**Court Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................. 6, 10, 17

**Other Authorities**

*Copyright and Artificial Intelligence Part 2: Copyrightability*, United States
    Copyright Office, https://www.copyright.gov/ai/Copyright-and-
    Artificial-Intelligence-Part-2-Copyrightability-Report.pdf ........................................ 15

6 *Patry on Copyright* § 19.4 (2012) ................................................................................ 6

U.S. Copyright Office, Compendium of U.S. Copyright Office Practices §
    313.4(H) .................................................................................................................. 3

## I. INTRODUCTION

It is hard to imagine a more well-supported copyright infringement complaint than the one in this case: it clearly shows how Defendants' Hailuo AI subscription service generates images and videos featuring Plaintiffs' famous copyrighted characters like Spider-Man, Darth Vader, Batman, Superman, Shrek, and the Minions. The complaint includes dozens of screenshots to prove it. Instead of acknowledging the obvious infringement, Defendants take the bizarre position that the claims are "artificial" and "fake." Defendants' attempts to wish this all away are not grounds for dismissal.

Defendants deliberately copied Plaintiffs' movies, television shows, and other copyrighted works to train and develop the Hailuo AI service, stored copies of Plaintiffs' copyrighted works and characters on their servers, and made exact copies of Plaintiffs' characters available for display and download to Hailuo AI subscribers. On top of that, Defendants brazenly advertised the Hailuo AI service's ability to produce images and videos that infringe Plaintiffs' characters. That Defendants used artificial intelligence to perpetuate their mass infringement does not immunize their conduct. If a software maker were to sell a word processing or slideshow application that came *pre-loaded* with perfect copies of Plaintiffs' iconic characters, so that users could readily include them in documents, slide shows, and other outputs, and then used Plaintiffs' characters to promote the product, no one would question that the software maker had engaged in copyright infringement. Defendants' infringement is just as blatant.

Defendants are liable for copyright infringement because of their direct and willful conduct in a multi-stage process designed and intended to cause infringement in the United States. They selected and curated a library of Plaintiffs' copyrighted works, and they controlled an ingestion and training process designed to ensure that copies of Plaintiffs' characters are stored in the Hailuo AI model so they can be reproduced and distributed in images and videos any time one of Defendants' U.S. subscribers types in a request (or "prompt") for those works—like a virtual vending machine stocked with Plaintiffs' well-known characters.

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

Defendants' attempt to blame their customers for Hailuo AI's piracy (because their subscribers *ask to receive* the infringing images and videos) is an unserious argument that would turn the Copyright Act on its head.  But even if a court were ever to accept such an absurd claim, the Complaint alternatively alleges Defendants' secondary liability for copyright infringement because Defendants actively induced third-party users—including through advertising (including a promotional video titled "Superheroes will heal your soul") and step-by-step instructions (including an explicit tutorial on how to combine Marvel and DC Comics superheroes in a single image)—to prompt the AI model to generate infringing images and videos.  *See* Compl. ¶¶ 169-173.  Defendants also are vicariously liable because they have obtained direct financial benefit from these infringing activities, which are a significant draw for their paying customers, even though Defendants have readily available legal and practical means to prevent infringement.

## II. STANDARDS FOR RULE 12(b)(6) MOTIONS

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*.  This standard "does not prevent a plaintiff from alleging facts upon information and belief where the facts are peculiarly within the possession and control of the defendant." *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017); *accord Anderson v. Intel Corp. Inv. Policy Comm.*, 137 F.4th 1015, 1025 (9th Cir. 2025).  The Court must accept plaintiff's allegations as true and draw all reasonable inferences in plaintiff's favor. *Williams-Sonoma, Inc. v. Amazon.com*, 627 F. Supp. 3d 1072, 1081-82 (N.D. Cal. 2020).

## III. ARGUMENT

**A.    Plaintiffs Have Sufficiently Alleged Their Ownership of the Iconic Characters Identified in the Complaint.**

**1.    It is well established that fictional characters can be separately protected by copyright law.**

Federal courts have long recognized that fictional characters—particularly characters that have been visually depicted in films, television shows, or comic books—are afforded copyright protection when the works in which they appear have been registered. *DC Comics v. Towle*, 802 F.3d 1012, 1019 (9th Cir. 2015); *accord Daniels v. Walt Disney Co.*, 958 F.3d 767, 771 (9th Cir. 2020); *Summit Kaiju LLC v. Legend Pictures*, 2022 WL 2235460, at *3-4 (C.D. Cal. Apr. 12, 2022) (registration of a work where a character appears is sufficient to show ownership of the character); U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 313.4(H) (same).  Here, the characters identified in the Complaint easily satisfy the Ninth Circuit's test for character protection, as shown below.  They also are independently protected as works of visual art, pursuant to the copyright registrations in the underlying works.

Under Ninth Circuit law, a character is entitled to copyright protection if it (1) has physical as well as conceptual qualities, (2) is sufficiently delineated to be recognizable as the same character whenever it appears, and (3) displays consistent, identifiable traits and attributes. *Daniels*, 958 F.3d at 771; *Towle*, 802 F.3d at 1021.  While a purely literary character can enjoy copyright protection, visually depicted characters are more readily afforded protection because they have "physical as well as conceptual qualities" and thus are "more likely to contain some unique elements of expression." *Walt Disney Productions v. Air Pirates*, 581 F.2d 751, 755 (9th Cir. 1978); *see Anderson v. Stallone*, 1989 WL 206431, at *7-8 (C.D. Cal. Apr. 25, 1989) (holding characters from the *Rocky* films were protected by copyright and noting that "[a]s a practical matter, a graphically depicted character is much more likely than a literary character to be fleshed out in sufficient detail so as to warrant copyright protection").

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

A character does not lose its copyright protection merely because it is depicted in different ways across multiple works, provided it "display[s] consistent, identifiable character traits and attributes." *Towle*, 802 F.3d at 1021 (The Batmobile was protected due to its consistent "bat-like appearance" in comic books, television series, and movies, even though its specific characteristics "have changed from time to time"); *Daniels*, 958 F.3d at 771; *Metro-Goldwyn-Mayer Studios v. American Honda Motor*, 900 F. Supp. 1287, 1296-97 (C.D. Cal. 1995) (finding James Bond to be a protectable character, despite being portrayed by different actors across multiple films); *see also Air Pirates*, 581 F.2d at 754 (that "in some instances defendants used the challenged cartoon figures in different plots than Disney's or portrayed them with altered personalities" was immaterial because "[t]he test is whether the figures drawn by Defendants are substantial copies of the work of Plaintiff").

> **2.      Plaintiffs have sufficiently alleged that the characters identified in the Complaint are protected by copyright.**

Defendants' claim that the familiar characters enumerated in the Complaint—repeatedly through both verbal descriptions and color images—somehow do not warrant copyright protection is hard to take seriously.  These are not generic or marginal characters. Plaintiffs are suing over Superman, Batman, the Joker, Spider-Man, Wonder Woman, the Hulk, Iron Man, Bart Simpson, Darth Vader, Yoda, and Shrek, among others.  These are, without exaggeration, some of the most famous and instantly recognizable characters of all time—characters whose visual depictions, personality traits, and narrative roles have been developed across decades of films, television shows, and other media. They easily satisfy the threshold for character protection under *Towle*.

There can be no reasonable argument that Defendants do not know what characters are at issue in this lawsuit—that they are somehow left "guessing" (Mot. 8) despite all the descriptions and pictures in the Complaint.  At the pleading stage, courts do not require an "extensive and exhaustive list of traits or characteristics" but merely a "sufficient description to plausibly allege that [the character] is distinctive and has unique elements of

expression." *Summit Kaiju*, 2022 WL 2235460, at *4; *Biani v. Showtime Networks*, 2024 WL 6836918, at *4 (C.D. Cal. Mar. 29, 2024). Even if it were a close call—which is not the case—the question of whether a character warrants copyright protection would be addressed more appropriately on summary judgment, *after* the development of a full factual record. *See, e.g.*, *Towle*, 802 F.3d at 1021-23; *Moonbug Ent. v. BabyBus (Fujian) Network Tech. Co.*, 2023 WL 11922845, at *7 (N.D. Cal. Mar. 7, 2023); *see also Carroll Shelby Licensing v. Halicki*, 138 F.4th 1178, 1183 (9th Cir. 2025).

For the characters identified in the Complaint, Plaintiffs have more than sufficiently alleged that they have "expressive," "distinctive," "unique," "iconic," and "immediately recognizable" conceptual and physical qualities. *E.g.*, Compl. ¶¶ 43 (Darth Vader, Yoda), 48-50 (Iron Man, Hulk, Spider-Man), 53 (The Simpsons family), 66-71 (Superman, Batman, Joker, Flash, Wonder Woman), 75-76 (Bugs Bunny, Daffy Duck), 82-83 (Scooby-Doo), 99-100 (Shrek, Puss in Boots). *See generally id.* ¶¶ 118-160 (visual depictions of Plaintiffs' characters).

These allegations make clear that the characters on which Plaintiffs base their claims are at least as fully delineated and recognizable as, if not more distinctive than, other characters courts have held to enjoy copyright protection. *E.g.*, *Toho Co. v. William Morrow & Co.*, 33 F. Supp. 2d 1206, 1216 (C.D. Cal. 1998) (Godzilla character protected by copyright because Godzilla "is always a pre-historical fire-breathing dinosaur alive and well in the modern world," notwithstanding that he had been portrayed as an evil character and a benevolent character across various films); *Burroughs v. Metro-Goldwyn-Mayer Inc.*, 519 F. Supp. 388, 391 (S.D.N.Y. 1981) ("Tarzan is the ape man. He is an individual closely in tune with his jungle environment, able to communicate with animals yet able to experience human emotions. He is athletic, innocent, youthful, gentle and strong. He is Tarzan."), *aff'd*, 683 F.2d 610 (2d Cir. 1982). Furthermore, courts already have held that several of the characters identified in the Complaint—including Batman, Superman, and some of the main *Star Wars* characters—are protected by copyright. *See, e.g., Warner Bros. Inc. v. American Broad. Cos.*, 720 F.2d 231, 235 (2d Cir. 1983) (Superman); *Sapon*

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

*v. DC Comics*, 2002 WL 485730, at *3-4 (S.D.N.Y. Mar. 29, 2002) (Batman); *Ideal Toy Co. v. Kenner Products*, 443 F. Supp. 291, 301 (S.D.N.Y. 1977) (Darth Vader, R2-D2, and C-3PO characters).

### 3. Plaintiffs have sufficiently alleged copyright registrations covering the characters at issue.

Plaintiffs have alleged they own all relevant copyright registrations that encompass all of the characters identified in the Complaint. *See* Compl. ¶¶ 15-31, 45, 51-52, 54-55, 58, 63-64, 73, 77, 80, 84, 89, 92, 96, 109. *See generally* Compl., Exs. A, B, C. Contrary to Defendants' assertion (Mot. 7), these recent registrations are not "largely irrelevant." Given that Defendants downloaded copies of Plaintiffs' works from the internet (among other sources) to develop and train the Hailuo AI service, allowing it to store copies of Plaintiffs' famous characters, the most logical and plausible inference is that these works are among those on which Defendants chose to illicitly train their AI model.

At the pleading stage, Plaintiffs are not required to list every relevant registration or attach all registration certificates to the Complaint. *See Browne v. Donalds*, 2024 WL 3468898, at *11 (C.D. Cal. May 28, 2024) ("[I]t is not necessary at [the pleading] stage for Plaintiffs to provide copyright registration numbers or registration certificates to plausibly allege copyright ownership."); *Kuhmstedt v. Enttech Media Grp.*, 2022 WL 1769126, at *3 (C.D. Cal. Apr. 11, 2022) (same); *Corelogic Solutions, LLC v. Credifi Corp.,* 2021 WL 1156860, at *10 (C.D. Cal. Jan. 29, 2021) (same); *see also Hybrid Promotions, LLC v. Zaslavsky*, 2016 WL 10988656, at *10 (C.D. Cal. Oct. 5, 2016) (failure to identify copyright registrations by number "is not fatal at the FRCP 12(b)(6) stage"); *KTS Karaoke, Inc. v. Sony ATV Music Publ'g*, 2012 WL 12887300, at *1 (C.D. Cal. Aug. 22, 2012) (same) (citing 6 *Patry on Copyright* § 19.4 (2012)). Plaintiffs will produce copies of all relevant copyright registrations during discovery.

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

## B.    Plaintiffs Have More Than Adequately Alleged Direct Infringement by Defendants.

### 1.    Defendants' vague assertions about extraterritorial copying at the training stage do not warrant dismissal.

Although the Copyright Act does not apply extraterritorially to conduct occurring *entirely* outside the United States, it is well established that overseas activities that are part of a process leading to infringement in the U.S. are within the scope of the Copyright Act. Defendants have never publicly disclosed where they engaged in copying for ingestion, training, or fine-tuning purposes—and they are careful not to say in their motion either. They hint that it might have taken place in China (Mot. 4, 6), but it is certainly plausible, if not highly likely, that at least some of the copying of Plaintiffs' copyrighted works occurred by scraping the U.S.-hosted and U.S.-facing websites of Plaintiffs or of U.S.-based companies like Meta/Facebook and Google/YouTube, with servers in the United States.

But even if that copying took place in another country, Plaintiffs have alleged a course of conduct where all stages of the development of Defendants' AI service are directed at causing infringement in the United States.[1]  Defendants operate a multi-stage infringement pipeline, through which they have deliberately targeted, selected, acquired, and curated Plaintiffs' copyrighted works for inclusion in their AI model by downloading them from the internet or other sources (*see* Compl. ¶ 162(a)), prepared this data for ingestion into the Hailuo AI model by cleaning and reformatting it, thereby making additional unauthorized copies (*id.* ¶ 162 (b)), and used this accumulated data, including Plaintiffs' copyrighted works, to "train" the AI model such that it embodies copies of Plaintiffs' works and is able to reliably reproduce, publicly display, publicly perform, and

---

[1] Defendants also falsely state that Plaintiffs "admit" that Nanonoble has no offices, employees, or servers in the U.S. (Mot. 11).  Plaintiffs admit no such thing and have no way of knowing at this point how extensively Nanonoble operates in the U.S.

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

distribute high-quality copies and derivatives of Plaintiffs' copyrighted characters for paying customers in the United States (*id.* ¶¶ 161, 162(c)).

Under well-established precedent, Defendants have committed copyright infringement under U.S. law, even if one or more steps in this process takes place overseas. In *Spanski Enterprises v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018), the court held that U.S. copyright law reached conduct occurring in Poland that caused the transmission of a performance that ultimately reached viewers in the United States. *See id.* at 916 ("a foreign broadcaster that … directs infringing performances into the United States from abroad commits a domestic violation of the Copyright Act"); *see also National Football League v. PrimeTime 24 Joint Venture*, 211 F.3d 10, 13 (2d Cir. 2000) (recognizing that a public performance or display "includes each step in the process by which a work wends its way to its audience").

In *Sound N Light Animatronics. v. Cloud B, Inc.*, the court held the plaintiff had alleged sufficient facts to apply the Copyright Act to overseas conduct where it claimed the defendant "actively targets potential consumers in the United States" with works copied outside of the United States. 2017 WL 3081685, at *7 (C.D. Cal. Apr. 7, 2017); *see also Los Angeles News Serv. v. Conus Commc'ns Co.*, 969 F. Supp. 579, 584 (C.D. Cal. 1997) (plaintiff sufficiently alleged that infringing acts occurred within the U.S. where "a Canadian transmission was received and viewed here"). Likewise, in *Shropshire v. Canning,* the court held that uploading an infringing video from Canada to YouTube's servers in California for the purpose that it be viewed in the U.S. was within the Copyright Act's scope. 809 F. Supp. 2d 1139, 1145-46 (N.D. Cal. 2011). And in *Crunchyroll v. Pledge*, the court held that the alleged infringing conduct was not "wholly extraterritorial," and thus within the ambit of Copyright Act, where the defendant copied and uploaded anime episodes in the United Kingdom that were then transmitted to viewers in the United States. 2014 WL 1347492, at *17 (N.D. Cal. Mar. 31, 2014).

Here, the Complaint alleges Defendants stored copies of Plaintiffs' copyrighted characters in the Hailuo AI model to make them available for display, performance, and

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

download in images and videos disseminated to customers in the U.S.; targeted the U.S. market by soliciting U.S. customers through an English-language website; stored video files containing reproductions of Plaintiffs' copyrighted characters in Cloudflare CDN servers in the United States; marketed their Hailuo AI service in the United States through the Apple App Store and Google Store; sold their AI service to and facilitated in-app purchases by U.S. customers in U.S. dollars; and advertised widely in the U.S. (including by touting online the ready availability of Plaintiffs' iconic characters and displaying infringing images). *See* Compl. ¶¶ 36(a)-(m), 111-193.  Because a copyright violation can encompass the entire process by which infringing material reaches an audience in the United States, Defendants' activities in copying Plaintiffs' works for ingestion, training, and distribution purposes—even if some occurred in China (which only discovery will reveal)—are well within the scope of the Copyright Act.

In addition, the Complaint alleges that each of the Defendants directly participates in the multi-step infringement enterprise described above. *See* Compl. ¶¶ 161-168.[2]  These are factual allegations, not mere conclusions, and they are sufficient at the pleading stage to state a claim against each of the Defendants, regardless of whether some members of the corporate family had larger roles than others. *See United States v. Bestfoods*, 524 U.S. 51, 55 (1998) (parent corporation directly liable for its own actions in operating a facility owned by a subsidiary); *Facebook Inc. v. Namecheap Inc.*, 2020 WL 6585534, at *6 (D. Ariz. Nov. 10, 2020) (parent company may be held liable "for the wrongdoing of a subsidiary where the parent directly participated in the subsidiary's unlawful actions") (quoting *Esmark, Inc. v. N.L.R.B.*, 887 F.2d 739, 756 (7th Cir. 1989)).

---

[2] The Complaint alleges that Nanonoble and SXJT (which Defendants concede are sister companies—*see* Decl. of Xue Zizhao ¶ 4, Dkt. No. 34-2)—work together to exploit their AI service in the U.S. market, where SXJT holds itself out as "MiniMax" and has filed a trademark application in that name and where Nanonoble has applied for the "Hailuo AI" trademark and conducts various other business activities in the United States.  Compl. ¶ 36(a)-(m).

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

### 2. Plaintiffs did not "authorize" infringement by using investigators to collect evidence of Defendants' copyright violations.

Defendants seek to sweep away the Complaint's output-related allegations with a sleight-of-hand, arguing—based on "evidence" outside the pleadings (Mot. 12) that cannot be considered on a Rule 12(b)(6) motion[3]—that "a copyright owner cannot infringe his own copyright." Defendants' argument ignores well-established case law holding that the actions of a copyright plaintiff's investigators do not somehow "authorize" or "license" a defendant's infringing activities. *See Microsoft Corp. v. Rivera*, 2019 WL 1641349, at *3 (C.D. Cal. Apr. 16, 2019) (direct and secondary infringement claims were sufficiently pled where infringing copies were "sold and delivered to [plaintiff's] investigator"); *see also Ryan v. CARL Corp.*, 23 F. Supp. 2d 1146, 1149 (N.D. Cal. 1998) (holding that "plaintiffs did not authorize defendants' conduct" by requesting copies); *Atlantic Recording Corp. v. Howell*, 554 F. Supp. 2d 976, 985 (D. Ariz. 2008) (copies obtained by plaintiff's investigator were unauthorized).

The argument also assumes away all of Plaintiffs' factual allegations of direct infringement by Defendants. Plaintiffs' use of investigators to collect evidence simply *confirms* what the Complaint makes clear: The Hailuo service—which Defendants designed, trained, and operate—reproduces and distributes infringing copies of Plaintiffs' characters. It makes no difference which customer "prompted" or asked for the unauthorized image and video outputs that Defendants create and distribute.

---

[3] The declaration from Defendants' lawyer provides no support for Defendants' motion. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018) (district court may not consider material beyond the pleadings on a Rule 12(b)(6) motion). It does, however, confirm that Defendants are able to match particular subscriber prompts with specific Hailuo AI outputs. Plaintiffs are confident discovery will show that Hailuo AI has generated millions of outputs containing reproductions of Plaintiffs' copyrighted characters.

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

### 3.    The Complaint describes in detail how Defendants are volitional actors.

Contrary to Defendants' suggestion (Mot. 13-14), the fact that their service generates outputs in response to user "prompts" does not somehow insulate them from liability for their unauthorized reproduction, distribution, display, and performance of Plaintiffs' copyrighted works.  Rather, the Complaint details a multi-stage process through which Defendants caused the infringements at issue—long before any user types a prompt.

Defendants intentionally designed their AI model through deliberate training and fine-tuning choices.  Defendants identified and selected copyrighted works containing images of Plaintiffs' characters for ingestion into their training data, then trained the Hailuo AI model to store copies and reproduce those characters.  *See* Compl. ¶¶ 12, 160, 162(a), 234.  Defendants then fine-tuned the model to optimize the fidelity of its character reproductions, building a commercial service that they aggressively advertised as capable of generating faithful copies of Plaintiffs' characters on demand.  *Id.* ¶¶ 162(b)-(c), 241. The prompts themselves, as shown in Plaintiffs' Complaint, do not contain any detailed descriptions or protectable elements of Defendants' characters.  The prompts are not responsible for generating the infringing outputs—Defendants are.  In sum, Defendants deliberately engineered a system to produce specific copyrighted content.

Moreover, Defendants' conduct is obviously volitional with respect to their violation of Plaintiffs' exclusive distribution right because Defendants have been making available copyrighted content for further reproduction, distribution, and display.  In *A&M Records v. Napster*, the Ninth Circuit held that the "making available" of digital works is a type of distribution, explaining that uploading copyrighted material and making it available for others to download from a file-sharing platform "violate[s] plaintiffs' distribution rights." 239 F.3d 1004, 1014 (9th Cir. 2001); *see also Perfect 10, Inc. v. Amazon.com*, 508 F.3d 1146, 1162 (9th Cir. 2007) (distribution can be "deemed" to occur when a party "stores" a copyrighted collection and "makes them available" to the public); *Hotaling v. Church of Jesus Christ of Latter-Day Saints*, 118 F.3d 199, 203 (4th Cir. 1997) (when a public library "adds a work to its collection, lists the work in its index or catalog system, and *makes the*

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

*work available* to the borrowing or browsing public, it has completed all the steps necessary for distribution to the public") (emphasis added).  Here, the Complaint goes much further, describing how Defendants have selected, reproduced, publicly displayed, publicly performed, and distributed Plaintiffs' copyrighted characters.  *See* Compl. ¶¶ 115–160.

### a.    Defendants satisfy all elements of the Ninth Circuit's volition standard.

In the Ninth Circuit, "volitional conduct" is a proximate causation inquiry.  It asks whether the defendant was "*actively involved* in the infringement."  *VHT, Inc. v. Zillow Group*, 918 F.3d 723, 732 (9th Cir. 2019); *accord Bell v. Wilmot Storage Servs.*, 12 F.4th 1065, 1081 (9th Cir. 2021).  Just as multiple tortious actors can be found to have proximately caused the same harm, there can be more than one volitional actor for any given infringement.  *E.g., Williams-Sonoma*, 627 F. Supp. 3d at 1080 n.4 (citing *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 669 (9th Cir. 2017)).[4]

Under *VHT*, a plaintiff satisfies the volition requirement by showing the alleged infringer "exercised **control** (other than by general operation of [its website]); **selected** any material for upload, download, transmission, or storage; ***or* instigated** any copying, storage or distribution" of the copyrighted works.  918 F.3d at 732 (emphasis added).  Volitional conduct typically turns on whether a system passively displays content selected and uploaded by third parties or whether the defendant selected the content that is displayed. *See id.*  In *VHT*, the court found no volitional conduct for photographs that were selected and uploaded to Zillow's platform by brokers and then automatically displayed, but the court *did* find volitional conduct where Zillow "selected and tagged" a curated subset of searchable photographs featured on a different section of the Zillow website.  *Id.* at 733-37.

---

[4] Where multiple actors cause the same infringement, they may be held jointly and severally liable.  *See, e.g.*, *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1263 (9th Cir. 2021).

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

A defendant is deemed to have selected content when it makes content-specific decisions, even if the selection itself is automated through an algorithm or design feature. Thus, the mere fact that Defendants have designed an automated, online system does not insulate them from infringement liability. *See Williams-Sonoma*, 627 F. Supp. 3d at 1083 (volitional conduct sufficiently alleged based on allegations that Amazon's algorithm automatically selected an infringing photo, for display on a product page, out of multiple competing seller product image submissions); *see also Atari Interactive v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1113 (N.D. Cal. 2021) (volitional conduct sufficiently alleged where Redbubble designed its software to combine user inputs with other material to produce and distribute infringing products); *EMI Christian Music Group v. MP3Tunes, LLC*, 844 F.3d 79, 96 (2d Cir. 2016) (volitional conduct found where automated music storage service was designed to retrieve copyrighted album cover art whenever a user uploaded a song, even though the user did not request that material).

Defendants unquestionably are volitional actors under *VHT*. **First**, as described above, Defendants exercised **control** over the model's outputs by deliberately designing and engineering their service to generate infringing content. This goes far beyond the "general operation" of a website.

**Second**, Defendants **selected** Plaintiffs' copyrighted works for inclusion in their platform and service. Like the Zillow moderators who "curated, selected, and tagged [photos] for searchable functionality," *VHT*, 918 F.3d at 737, Defendants (*not* their customers) selected Plaintiffs' copyrighted works for ingestion into their model.

**Third**, Defendants **instigated** the copying, storage, and distribution of Plaintiffs' familiar characters by building and operating a commercial service designed to reproduce them to paying subscribers upon request, and then by actively promoting that capability using the infringing outputs themselves. *See* Compl. ¶¶ 167, 169, 171-200. As detailed in the Complaint, Defendants also have chosen to populate their website's "Explore" promotional page with numerous examples of Plaintiffs' characters generated in response to subscriber prompts—all independent violations of Plaintiffs' public performance and

display rights.  Compl. ¶ 189.  This conduct amounts to textbook instigation under *VHT*. *See Dish Network v. Jadoo TV, Inc.*, 2023 WL 4004115 at *5-8, 10-11 (N.D. Cal. June 13, 2023) (finding instigation where defendant preloaded its set-top boxes with content, preconfigured those boxes to install copyrighted works, and failed to limit access after receiving infringement notices).

### b. Defendants' conduct goes far beyond operation of a passive, automated system.

Defendants' reliance on passive-system cases is entirely misplaced.  They argue that because Hailuo AI generates outputs in response to user prompts (Mot. 13-14), Defendants as a matter of law cannot be volitional actors.  But the cases on which Defendants rely are inapposite because they involved systems that stored, transmitted, or displayed content that *originated from* and was *selected entirely by* third parties, with no content-specific decisions made by the system owner.  The reason those defendants were *not* volitional actors is precisely the reason Defendants *are* volitional actors here.

In *Fox Broadcasting v. Dish*, for example, the court held on an injunction appeal that the district court did not abuse its discretion in finding that Dish's PrimeTime Anytime feature did not likely give rise to direct infringement liability because Dish's service copied television programs "only in response to the user's command."  747 F.3d 1060, 1067 (9th Cir. 2014).  In that case, Dish made no content-specific decisions about the particular programs that would be recorded, nor did Dish have any input into what programs were being aired on any particular channel.  The TV programs existed independently of Dish's technology; they were programs the users *already had purchased a satellite TV subscription to receive*; and the users simply chose which channels to record.  *See id.*

Defendants, by contrast, affirmatively selected and gathered Plaintiffs' copyrighted works for ingestion into their training data, engineered a model that effectively stored copies of Plaintiffs' copyrighted characters on Defendants' servers, and built a commercial distribution platform to distribute those reproductions to users.  Compl. ¶¶ 116, 161, 162(a)–(c), 163.  Defendants did not build a passive conduit through which users could

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

access content they were otherwise licensed to access.  Here, the copyrighted content originated with Defendants' own training, ingestion, and fine-tuning choices.  It does not come from the user or any third party but instead is pre-loaded and stored in the service before any subscriber submits a prompt.  When a Hailuo AI subscriber types in "Darth Vader" as a prompt, the subscriber does not need to upload an image of Darth Vader or describe the character's many unique visual qualities. Instead, Hailuo AI supplies all of the expressive, infringing content because Defendants have designed it to do so: the model knows exactly what Darth Vader looks like precisely because Defendants trained and fine-tuned it on the *Star Wars* franchise.[5]

## C.    Defendants' Arguments on Plaintiffs' Claims in the Alternative for Secondary Liability Do Not Remotely Warrant Dismissal.

Even if the Court were to conclude that Defendants are not direct infringers—a conclusion the pleadings do not support and the evidence will not support—Defendants' attempt to wave away this alternative basis for liability is without merit.  ***First***, the fact that Plaintiffs used investigators to gather evidence of Defendants' unlawful activities—since Plaintiffs cannot review Defendants' subscriber records absent discovery—does not mean those activities did not take place.  The Complaint's detailed factual allegations are more than sufficient at the pleading stage to support a plausible inference that Hailuo AI was in fact generating images and videos featuring Plaintiffs' characters in response to user requests.  (Indeed, Defendants' counsel's declaration has confirmed that Defendants possess granular records of each subscriber's prompts and corresponding outputs, making

---

[5] As the U.S. Copyright Office has concluded, "[t]he gaps between prompts and resulting outputs demonstrate that the user lacks control over the conversion of their ideas into fixed expression, and the system is largely responsible for determining the expressive elements in the output." *Copyright and Artificial Intelligence Part 2: Copyrightability*, United States Copyright Office, https://www.copyright.gov/ai/Copyright-and-Artificial-Intelligence-Part-2-Copyrightability-Report.pdf.

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

it straightforward to demonstrate the extent of infringement once Plaintiffs can conduct discovery.)[6]

In other copyright cases involving secondary liability claims against AI models, courts have explicitly rejected the exact arguments made by Defendants here. *See New York Times v. Microsoft*, 777 F. Supp. 3d 283, 306-07 (S.D.N.Y. 2025) (holding that where plaintiffs included dozens of pages of allegedly infringing outputs in their pleadings, along with "allegations of widely publicized instances of copyright infringement by end users of defendants' products," that gave rise to "a plausible inference of copyright infringement by third parties"); *Advance Local Media v. Cohere*, 2025 WL 3171892, at *4-5 (S.D.N.Y. Nov. 13, 2025) (rejecting similar argument about prompting and holding that, where plaintiffs provided numerous examples of outputs received by their investigators, who were alleged to have used a "variety of common-sense, natural-language user queries," the allegations were sufficient to "raise a reasonable expectation that discovery will reveal additional evidence of third-party infringement").

***Second***, the Complaint includes numerous allegations about Defendants' reproduction and distribution of images and videos featuring Plaintiffs' copyrighted characters in response to prompts *from third party users*. *See* Compl. ¶¶ 186-200. These include multiple examples where Hailuo subscribers have posted infringing images and

---

[6] Citing *Grokster*, Defendants chide Plaintiffs for not alleging details about the volume of infringing activity on Defendants' service (Mot. 15, 19), but those facts were developed only through extensive discovery leading up to summary judgment. *See Metro-Goldwyn-Mayer Studios v. Grokster, Ltd.*, 545 U.S. 913, 922 (2005).

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

videos featuring Plaintiffs' characters (which were generated by Defendants) on Reddit, TikTok, Instagram, and YouTube. *See id.* ¶¶ 194-199.[7]

### 1. Plaintiffs have sufficiently alleged vicarious liability.

A defendant is vicariously liable for copyright infringement if it "enjoys a direct financial benefit from another's infringing activity and 'has the right and ability to supervise' the infringing activity." *Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004) (quoting *Napster*, 239 F.3d at 1022, and *Fonovisa, Inc. v Cherry Auction*, 76 F.3d 259, 262 (9th Cir. 1996)). The financial benefit need not be substantial in proportion to the defendant's overall profits, so long as the availability of material that infringes the plaintiff's rights is a "draw" for customers. *Id.* at 1078-79 ("There is no requirement that the draw be 'substantial.'"); *accord Giganews*, 847 F.3d at 673 ("[T]he size of the 'draw' relative to a defendant's overall business is immaterial."); *Live Face on Web, LLC v. Roshdieh*, 2016 WL 11505589 (C.D. Cal. Nov. 16, 2016) (that the alleged direct financial interest "may be unquantifiable or insignificant does not render [plaintiff's] claim implausible under *Ellison*"). Defendants' argument that they receive a "flat fee" regardless of the content generated (Mot. 17) thus misses the point—the question is not whether Defendants charge specifically for infringing content, but whether the availability of infringing content attracts potential customers to subscribe.

As alleged in the Complaint, Defendants control the inputs and outputs of their AI service and have contractual relationships with their subscribers, which gives them both "the legal right to stop or limit" their customers' infringing conduct, as well as "the practical ability to do so." *Perfect 10, Inc. v. Amazon.com*, 508 F.3d at 1173. Defendants'

---

[7] Defendants' passing suggestion (Mot. 12) that alleged infringing uses by subscribers are protected by fair use is entirely without support and not a proper basis to seek dismissal under Rule 12(b)(6). *See Browne v. McCain*, 612 F. Supp. 2d 1125, 1130 (C.D. Cal. 2009) (declining to address whether use of a song in a political ad was fair use on motion to dismiss because the parties had not conducted discovery); *Four Navy Seals v. Associated Press*, 413 F. Supp. 2d 1136, 1148 (S.D. Cal. 2005) (fair use "is inappropriate for determination in a 12(b)(6) motion").

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

assertion that they lack the ability to police infringement (Mot. 16) ignores the fundamental nature of their system. Unlike a platform that merely hosts the content of others, Defendants' decision to include copies of Plaintiffs' copyrighted characters in their system through training is the reason their subscribers can use it to create infringing images, which shows that Defendants exercise control over the infringing activity. Had Defendants chosen not to train their model with Plaintiffs' copyrighted works, the model would not be able to reproduce perfect copies of those characters. (One effective way to prevent a vending machine from dispensing certain items, after all, is simply not to stock it with those items.) *See Fonovisa*, 76 F.3d at 263 (holding swap meet operator vicariously liable for vendor's sale of pirated goods because operator had the ability to exclude vendor from swap meet, which would prevent infringing sales from taking place).

In addition, the Complaint explains how software "guardrails" and other filtering technologies were readily available to Defendants to prevent or limit copyright infringement (Compl. ¶¶ 12, 201-203, 207), that such technological solutions were used by Defendants' competitors (*id.* ¶ 202), that Defendants chose to exercise control over their system's outputs by employing software tools to limit violence and nudity (*id.* ¶¶ 204-205), but that Defendants nevertheless made a deliberate decision ***not*** to implement any infringement filtering prior to the filing of this lawsuit (even after receiving a cease-and-desist letter from Plaintiffs) (*id.* ¶ 209). As described above, Defendants further exercise control by internally reviewing and editing user prompts to enhance the delivery of Plaintiffs' copyrighted characters. Compl. ¶¶ 206-207.

Defendants' advertising and promotion efforts confirm they are using Plaintiffs' characters as a "draw" to their business. Why go to the trouble of so extensively advertising the ready availability of Plaintiffs' characters if Defendants did not intend and expect that such promotional activities would draw customers to the service? *See BMI v. QM Entertainment*, 2026 WL 972408, at *5-6 (W.D. Wash. Apr. 10, 2026) (direct financial benefit was "demonstrated by the establishment's continued advertisement" of infringing performances). Here, Defendants use Plaintiffs' characters to draw customers in multiple

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

ways—through their website's "Explore" page, through advertising on social media, and by displaying user prompts that generated infringing content to educate users how to replicate the infringement. *See* Compl. ¶¶ 169-185, 192-193.

### 2. Plaintiffs have sufficiently alleged contributory infringement.

Under the Supreme Court's *Grokster* decision, "one who distributes a device with the object of promoting its use to infringe copyright, as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties." 545 U.S. at 919. Specifically, the Court found the defendants could be liable for inducing infringement by users of their services where they "acted with a purpose to cause copyright violations by use of software suitable for illegal use." *Id.* at 938. The *Grokster* defendants (like defendants here) advertised and promoted their services' abilities to facilitate copyright infringement, expressly encouraged and assisted subscribers to engage in copyright infringement, failed to develop "filtering tools or other mechanisms to diminish the infringing activity using their software," and built and profited from a business model that relied on infringing use. *Id.* at 937-940.

In its recent *Cox* decision, the Supreme Court confirmed that the provider of a service may be liable for contributory infringement where it "intended that the provided service be used for infringement." *Cox Communications, Inc. v. Sony Music Entertainment*, 146 S. Ct. 959, 967 (2026). Defendants' lengthy discussion about the potential non-infringing capabilities of their AI service (Mot. 18) is therefore beside the point. Where evidence "shows statements or actions directed to promoting infringement, *Sony*'s staple-article rule will not preclude liability." *Grokster*, 545 U.S. at 935 (citing *Sony Corp. v. Universal City Studios*, 464 U.S. 417 (1984)).

Defendants' arguments on inducement ignore the detailed allegations in the Complaint about Defendants' flagrant advertising efforts and step-by-step tutorials touting the ability of Hailuo AI to produce infringing images of Plaintiffs' characters. *See* Compl. ¶¶ 9, 169-185, 189-193. These are far more than "scattered references" (Mot. 20), and they

concretely establish Defendants in fact did take numerous affirmative steps to "target, attract, [and] assist users seeking to infringe" (Mot. 21).

Defendants also ignore Ninth Circuit settled law that "affirmative steps taken to foster infringement" include advertising the availability of infringing material on a defendant's service and encouraging use of the service for infringing purposes—precisely the conduct the Complaint alleges Defendants engaged in. As *Grokster* instructs, "[t]he classic instance of inducement is by advertisement or solicitation that broadcasts a message designed to stimulate others to commit violations." 545 U.S. at 937; *id.* at 936 (inducement shown by "advertising an infringing use or instructing how to engage in an infringing use").[8]

In the *Fung/IsoHunt* case, the Ninth Circuit confirmed that inducement was established based on the defendant's "active encouragement of the uploading of torrent files concerning copyrighted content," including by maintaining a list of "Box Office Movies" and encouraging users to upload copies of the highest-grossing movies then playing in U.S. theaters. *Columbia Pictures Industries v. Fung*, 710 F.3d 1020, 1035-36 (9th Cir. 2013). Numerous courts in this District likewise have held that inducement was sufficiently established by evidence that a defendant advertised or promoted the use of its service for infringing purposes. *E.g.*, *Amazon Content Servs. v. DeBarr*, 793 F. Supp. 3d 1242, 1253 (C.D. Cal. 2025) (defendant, a subscription-based streaming service, advertised via YouTube that subscribers could stream plaintiffs' copyrighted works); *Dunham v. Lei*, 2021 WL 4595808, at *7 (C.D. Cal. June 7, 2021) (defendant merchandiser printed user-uploaded infringing works onto consumer products and specifically advertised goods bearing the plaintiff's copyrighted works); *David v. CBS Interactive*, 2012 WL 12884914,

---

[8] Defendants' invocation of comments about advertising in the *Sony/Betamax* decision is misplaced (Mot. 19-20) because the Supreme Court determined in that case (after a trial on the merits) that the home-recording uses being advertised and promoted by the defendants were overwhelmingly fair uses—namely, personal recording for time-shifting purposes. *See* 464 U.S. at 455.

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

at *5 (C.D. Cal. July 13, 2012) (defendant distributed P2P programs, allowing users to download copyrighted material, and posted videos online demonstrating how to use the software to search for copyrighted songs by famous artists).

The fact that Defendants chose to hype Hailuo AI as "a Hollywood Studio in your pocket" (Compl. ¶1) more than plausibly supports an inference that Defendants intended to promote their service's ability to serve up infringing images and videos featuring Plaintiffs' (i.e., the biggest Hollywood Studios') famous characters derived from movies and television. That Defendants' advertisements prominently featured such immediately recognizable "Hollywood Studio" characters as Black Panther, Wolverine, Deadpool, the Flash, and the Joker reinforces the point. *Id.* ¶¶ 9, 169-185. Defendants also solicited subscribers to collaborate in "paid partnerships" by requesting and downloading video clips that featured Iron Man and Deadpool. *Id.* ¶ 170. Defendants further displayed Plaintiffs' characters, including Buzz Lightyear, Spider-Man, the Hulk, Superman, Batman, and the Joker, in advertisements on Defendants' Instagram, TikTok, and WeChat social media accounts. *Id.* ¶¶ 174-185.

In one brazen example, Defendants enticed customers to "open Hailuo AI" and then "just type what you want." The video then showed a screenshot of Hailuo's video generator, demonstrating how the prompt "Spider-man and Supergirl kissing in the park" immediately generated a video showing perfect digital replicas of those Disney and Warner Bros. Discovery-owned characters kissing in front of a lake in a park. *Id.* ¶¶ 10, 171-173. In another promotion, Defendants posted a video on their official YouTube channel titled "Superheroes will heal your soul" that featured a parade of Plaintiffs' famous characters. *Id.* ¶ 169.

Furthermore, as *Grokster* observed, a service provider's failure to develop "filtering tools or other mechanisms to diminish the infringing activity using [its] software" weighs in favor of a finding of inducement, even if it is not sufficient by itself. *See* 545 U.S. at 939; *Fung*, 710 F.3d at 1036-37; *Arista Records v. Lime Group*, 784 F. Supp. 2d 398, 429-

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

30 (S.D.N.Y. 2011).  As noted above, Defendants rejected the inclusion of any filters or guardrails to prevent copyright infringement when they launched their service in the U.S.

## IV. CONCLUSION

Defendants' motion to dismiss should be denied in its entirety.

Dated:  May 1, 2026                  JENNER & BLOCK LLP


By:   _____/s/ David R. Singer_____
                        David R. Singer
                        Julie A. Shepard
                        Andrew J. Thomas
                        Lauren M. Greene

                        *Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,991 words, which complies with the word limit of L.R. 11-6.1.


Dated:  May 1, 2026          By:  _____ */s/ David R. Singer* _____
                                         David R. Singer

PLAINTIFFS' OPPOSITION TO RULE 12(b)(6) MOTION TO DISMISS